(38 South. 701.)

No. 15,495.

JACKSON et al. v. NATCHEZ & W. RY. CO.*

(May 8, 1905.)

CARRIERS—INJURY TO PASSENGERS—RIGHTS OF EXCURSIONISTS — NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—EMERGENCY TOOLS — FALL OF BRIDGE.

1. Excursionists have the right to return home on the train by which they were taken out, and if, owing to the crowded condition of the train, they can secure no safer position than the platforms, it is not negligence on their part to ride thereon.

2. The defense of contributory negligence is not inconsistent with the denial of negligence on the part of defendant.

3. The failure to equip a train with the tools usually carried by trains for emergency use in case of a wreck is negligence, and, where, for want of such tool, a passenger is not rescued as promptly as would otherwise have been practicable from his position in the debris of a wreck, the railroad company will be held responsible in damages for such additional sufferings, regardless of whether the wreck itself was or was not caused by its negligence.

4. A railroad company will be held responsible for the injury to a passenger resulting from the collapse of one of its bridges, unless it can show that the bridge was as safe as the highest degree of practical care and skill could make a bridge of that class, and that, to the fullest extent that the highest degree of care and foresight could suggest, such bridge was inspected for discovering and remedying any defects that might have developed in it from the operation of the road or other causes, and, in case the defect was latent in the materials, then that the materials were thoroughly tested before being put in position.

(Syllabus by the Court.)

Appeal from Tenth Judicial District Court, Parish of Concordia; J. L. Dagg, Judge.

Action by Amelia Jackson and husband against the Natchez & Western Railway Company. Judgment for plaintiffs, and defendant appeals. Reversed.

Harry Hinckley Hall and Samuel Lucius Elam, for appellant. Nathan Meredith Calhoun and Dinkelspiel & Hart, for appellees.

PROVOSTY, J. The defendant railway company gave a Fourth of July excursion

*Rehearing denied June 5, 1905.

for colored people out of Vidalia to Turtle Lake, as had been done for several years past. Vidalia is a town situated on the Louisiana side of the Mississippi river, opposite Natchez, Miss. Turtle Lake is a picnic grounds near the station of the same name on the defendant's railway. Neither on the grounds nor at the station is there any protection whatever against the weather for excursionists, save two or three negro cabins in the vicinity of the station, where shelter for a limited number of persons might perhaps be had for the asking.

It was a one-day excursion, going out in the morning and returning in the evening. The train was composed of one locomotive, one tank car, one box car, two coaches, two flat cars, and five box cars. Going out, the train was crowded even to the platforms, and the regular afternoon train out of Vidalia carried more people to Turtle Lake. Others, who had come in wagons, stayed over to return in the evening on the excursion train. The train was taken to a station beyond Turtle Lake, to be brought back at about 9 o'clock; but, some rain having fallen, and the track being slippery, the locomotive was unable to pull the entire train, even in its empty condition, and five cars were dropped on the way. A drizzling rain had set in, and the night was so dark that a person could not recognize his elbow neighbor, except by the sound of his voice. A crowd of eight or nine hundred excursionists stood on both sides of the track, in the dark and the rain, awaiting the arrival of the train. It came on in the dark, without a single light aboard save the headlight of the locomotive. What took place might have been anticipated, and can be readily imagined. There was a wild scramble in the dark for getting aboard, even before the train had fully stopped.

Plaintiff, a healthy, vigorous young colored woman, was one of the excursionists. She says she scrambled with the rest to

get aboard, and got on the platform of one of the coaches, and secured a hold on the jamb of the door, while her companion and friend, Jennie Stewart, held on her, with an arm around her waist. Sam Gross testifies that he accompanied plaintiff to, and helped her on, the platform, and advised her to try to get inside, out of the weather.

After waiting some 10 minutes for everybody to get aboard, the president of the road, Davis, who was in charge of the excursion, went around with a lantern to see how eight or nine hundred people had managed to crowd themselves on one locomotive, one tank car, one box car, two coaches, and two flat cars. In this enumeration of the cars we intentionally include the locomotive, because it afforded coigns of vantage where not a few were lucky enough to get a foothold, and even also a handhold probably. Plaintiff was not so fortunate as that, if we are to believe defendant's contention that she occupied a position between two coaches, holding on by the tips of her feet to the edge of the platform of one coach, and by her buttock to the railing of the platform of another. A man, says Davis, was found "standing with one foot on the platform of the coach, and his other foot on the head block of the box car; and there was a little girl standing right up by the side of him. She was hanging by a brake staff, with nothing else underneath, except she had her hand on a coupler."

Whatever plaintiff's position was, the train, after moving about 100 yards and coming to a stop from the inability of the locomotive to pull it, finally started, and had made about three miles, at a rate estimated at from three to eight miles an hour, when a bridge gave way, right under where plaintiff was, and plaintiff fell among the wreckage, and suffered the injury for which she brings the present suit in damages, charging that the accident occurred through the negligence of the defendant company.

Plaintiff's end of the coach had dropped down until the coach stood at an angle of 45 degrees. Plaintiff was found outside of the platform, half seated on the edge of it, holding onto the railing with both hands, up to her waist in the débris of the bridge, both her feet under the platform behind her, and both her legs caught, below the knee, between it and a piling, one of them apparently simply caught and pinned, the other held crushed and mashed against the piling.

In that position of torture she remained for about three hours, until an ax could be procured from a distance and the piling chopped away. The engine had gone out of commission for want of water, and could not be utilized for getting this ax, or for hauling to Vidalia that part of the train which had crossed in safety. The next morning it was supplied with water from the bayou by means of buckets, and plaintiff was taken to Vidalia, after she had remained on an improvised stretcher all night in the woods and in the weather. The record does not specify at what hour she reached Vidalia, but by that time, although she had received medical aid immediately after she had been extricated from her horrible position, she was in a dying condition. The most powerful restoratives had to be administered to her, and for 48 hours her life hung by a thread. The mashed leg had to be amputated. The other, which had only a simple fracture, was reset. The record leaves it doubtful whether she has the use of this other leg; but she testifies that she can no longer earn a livelihood, and that she is now dependent upon her father for support.

The coach, in falling, became uncoupled from that in front, and the latter crossed safely. Defendant's contention is that, when the coaches separated, plaintiff lost her precarious foothold, and dropped straight down into the wreckage, and that her in-

jury was due exclusively to her fault in occupying this dangerous position. Plaintiff and her companion, Jennie Stewart, say that with the sudden dipping of the coach they slipped and fell, and that plaintiff's feet were caught in the wreckage, whereas only Jennie Stewart's dress was thus caught.

Accompanying Davis and his solitary lantern on the inspection tour before the starting of the train, there went Campbell, justice of the peace and mayor of Vidalia, Roundtree, deputy sheriff, and Johnson, colored deputy sheriff. All four testified for defendant.

Davis says he found plaintiff in the acrobatic position between the two coaches, described above.

Campbell says that she "was sitting on the floor of the platform, just to the left of the door, with one foot stretched straight out on the platform, and the other sorter hanging over towards the step."

Johnson says that he saw plaintiff sitting either on the floor of the platform, or on the hand railing—he could not be positive which—"with her legs hanging down between the cars."

Roundtree does not remember seeing plaintiff, nor having heard the colloquy described by Davis and Johnson as having taken place between her and Davis wherein Davis is said to have urged her to get down and to have warned her of the danger of her position. Plaintiff and her companion, Jennie Stewart, deny positively that Davis spoke to plaintiff.

When the case came on for trial, defendant applied for a continuance, on the ground of the absence of four material witnesses, namely, Lucas Johnson, Joel Baer, Israel Garner, and Clarence Bryant. Davis, the president of the defendant company, made an affidavit to the effect that he expected to prove by these absent witnesses that they were "on the same coach with plaintiff at the time of the accident, and that plaintiff was sitting on the guard or the hand rail of the platform of the coach with her feet resting, or upon, the platform of the coach immediately in front of the coach on which plaintiff was sitting down on said guard or hand rail"; that they were near plaintiff, "and could well see the position she was in." For the purpose of avoiding a continuance, plaintiff admitted that said witnesses, if present, would testify as stated in the affidavit.

Cross-examined as to the extent of his information touching these witnesses, Davis said that Lucas Johnson had told him that "there was a man right by the side of this girl, and he was pulling his feet out from behind the same tie that was in front of her, and that this was Israel Garner, and that he was in Arkansas." Questioned as to when and where Lucas Johnson had told him this, Davis answered:

"It was, I think, in Judge Elam's office, on the day, if I remember, when we expected to try the case, the latter part of last week."

Questioned further, he answered:

"I don't know whether it was that day or not. I saw him over here; he was here. Q. Is Lucas Johnson a colored man? A. Yes, sir. Q. Is he a black man or a mulatto? A. I didn't pay particular attention to his color; I did not see him but a few minutes. Q. Is he a tall man or a low man? A. I didn't pay particular attention to him; I expect he is an ordinary-sized man. Q. Is he a slender man or a stout man? A. I think my answer will cover that. Q. But you actually did have a conversation with him? A. Yes, sir; that is, my attorney did, and I think I told him who he was."

Touching Clarence Bryant, he said:

"I don't remember who—I think Tom Johnson—told me about Clarence Bryant. I believe so; I am not positive; and Clarence Bryant lives in Natchez, Miss. I don't know whether I talked with him or not. I did not talk with him in Judge Elam's office. I saw him, and I may have talked to him, but that was last week, before this affidavit was filed."

Touching Joel Baer, he says:

"Capt. Richardson, of the Natchez & Vidalia Ferry, informed me in reference to Joel Baer, and I sent for Joel Baer and tried to have him to come down to the ferryboat on the Natchez side. He is a watchman, as I understand, on

the Betsy Ann, and was asleep and would not come."

A great many witnesses on the trial were asked if they had seen any of these four men on the excursion, or at the picnic, and not one of them had seen any of them; and not one of them knew them, or of them, except one, Sol. Carter, who knows Lucas Johnson when he sees him.

Under the foregoing testimony, it is not over certain that Clarence Bryant, Joel Baer, and Israel Garner are not so many Mrs. Harrises, or that, if real creatures of flesh and blood, and produced on the witness stand, they would have testified as stated, or that Lucas Johnson would have done so; but certain it is that if they had so testified nobody would have believed them, for at the time of the accident there was not even the solitary lantern, and it is an incontestable fact in the case that the night was too dark for anything to be seen, and it is simply impossible that the witnesses should have seen the position of plaintiff's feet. Among the large number of witnesses who testified in the case, not a single one was able to name a single one of the persons who were on the particular car on which he or she was, except their own traveling companion, of whose presence they were cognizant otherwise than by sight, and except also in a few instances where they recognized a neighbor by his or her voice.

The facts must be taken to be that the plaintiff was standing on the platform, and that with the sudden dip of the car she slipped, as she and her companion Jennie Stewart say they did.

Davis is flatly contradicted by plaintiff and her companion, Jennie Stewart, and by his own two witnesses who accompanied him on the inspection tour; by Campbell, who says that plaintiff was seated on the floor of the platform; and by Johnson, who says that plaintiff's "legs were hanging down between the cars"; and to some extent he is contradicted by Sam Gross, who helped plaintiff to get on the platform, and advised her to try to get inside, out of the weather; and is corroborated only by what it is admitted his absent witness, Lucas Johnson, and his three other, more or less mythical, absent witnesses, would swear to if present. The jury evidently believed plaintiff's statement, and refused to credit Davis and his four continuance witnesses; and the case, as a whole, impresses this court in the same way.

So far as the pretended admissions made by plaintiff while her legs were being mashed between the car platform and the bridge piling, and after reaching Vidalia, are concerned, and so far as the statement made by some of defendant's witnesses to the effect that plaintiff was not suffering while pinned in the wreckage are concerned, the jury evidently did not believe them. The said admissions were not heard by the persons who were holding plaintiff up, or by any of the bystanders. These heard plaintiff crying out in her agony, and calling upon the Lord. From the excess of pain she fainted twice. By the time she reached Vidalia she was, as already stated, in a dying condition. The court believes the plaintiff when she says:

"No sir, I did not say anything like that. I did not have that much sense then."

Defendant's able counsel argue that plaintiff must have been standing outside of the railing of the platform, as testified to by Davis and his four continuance witnesses, because she was found outside of the railing after the accident; but while counsel argue that the spaces between the uprights of the railing were not sufficient to allow of plaintiff's having slipped through, the testimony on the point is silent, and, the court will add, unnecessarily and suspiciously silent.

A dilemma is presented to defendant. Plaintiff's position was reasonably secure, or it was not. If it was reasonably secure, her

adopting it as the only chance provided her for getting home that night out of the dark and rain was not negligence, on the same principle that riding on the platform of the coach is not negligence where no better accommodation is provided. 6 Cyc. 653. It is also to be noted that, if it be true that she occupied it, then that she occupied it safely until the bridge broke down, and, presumably, might have continued to occupy it safely to the end of the journey but for the breaking down of the bridge.

On the other hand, if it was so insecure that her occupying it, even under stress of the circumstances, was unreasonable, then it was the bounden duty of Davis, as conductor of the train, to insist upon her getting down, even if his sole means of compelling her was to refuse to start the train until she had done so. He had no right to assume that she realized as fully as he did the danger of the position. Under certain circumstances it is the duty of the carrier to protect the passenger against his or her own negligence, under penalty of the failure to do so being regarded as the proximate cause of a resulting accident. 6 Cyc. 641. And all the more imperative is this duty in a case where it has been the overcrowding of the train, resulting from the mismanagement of the carrier, that has forced the passenger to occupy the dangerous position. 6 Cyc. 623.

Indeed, considering that people were riding on the top of the box cars, on the engine, and virtually wherever they could manage to hold on—and all through defendant's fault by not providing better accommodation—and with the full knowledge of the president of the road, any charge against a passenger, especially against a young colored woman, of riding in a negligent manner, comes out of the mouth of the defendant with poor grace.

But it is not necessary to go into all these questions, since the court finds that plaintiff was riding on the platform.

Davis says that he went around the train telling those who were in dangerous places that they had to get off, but he does not say that he requested those who had been so fortunate as to secure standing room on the platforms to get down. His statement is that those on the platforms were not in so dangerous a position, because "they are protected by the guard rails."

The clear duty of Davis was to exclude from the train all those who, not belonging to the excursion and unprovided with tickets, had no right thereon. His lame excuse that he could not control the crowd cannot serve. Nothing shows that he could not have done so; at any rate, he made no serious effort in that direction. He had in his own hands the remedy of refusing to start the train until all those not belonging thereon should have got off. The truth of the matter is that the utter inadequacy of the accommodation, and the darkness, had brought about a situation of very great difficulty, calling for heroic treatment, and that Davis, instead of dealing seriously with it, followed the course least troublesome to himself, evidently not realizing the extent of his responsibility in the premises.

Those who were on the platforms had a right to remain there. Their contract entitled them to get home on that particular train (6 Cyc. 581), and, if the platform was the safest place they could secure, they had the right to occupy it. Defendant's witness Roundtree says that the cars were a perfect jam; that he tried to get on, but could not.

Under the circumstances—the choice lying between riding on the platform and staying the greater part of the night, if not all night, in the rain and the dark—it was not negligence for plaintiff to ride on the platform. Rapalje & Mack, Dig. vol. 2, p. 503, No. 476; Id. p. 375; Lynn v. Southern Pac. Co. (Cal.) 36 Pac. 1018, 24 L. R. A. 710; A. & E. E. of L. vol. 5, p. 678; 6 Cyc. 653, notes 38 and 39.

We conclude that plaintiff was not guilty of contributory negligence, and pass to the question of defendant's negligence.

The learned counsel for plaintiff argue that the defendant, having pleaded contributory negligence, which is a plea in confession and avoidance, has thereby admitted its negligence, and shifted the burden of proof in that regard. In reply to this, the learned counsel for defendant say that the answer does not contain a plea of contributory negligence, but that, on the contrary, it expressly alleges that the injury of plaintiff was due entirely to her own negligence; that she was the sole cause of it.

It is true the answer reads in that way, but it must be taken to mean that the plaintiff contributed to the accident, not that she was the sole cause of it. To say that she was the sole cause of it would mean that she had caused the bridge to collapse and the coach to be precipitated. This, evidently, was not the idea meant to be conveyed, and no one in the lower court so understood the answer. It was taken to be a plea of contributory negligence, and the case was tried on that theory. On any other theory, nine-tenths of the evidence offered by defendant would have been irrelevant, and the affidavit of its president to the materiality of the expected testimony of the four absent witnesses would have been untrue.

But the court does not agree with the contention that a plea of contributory negligence, when properly pleaded in the alternative (and it must be taken to have been so pleaded in this case, if at all), admits the negligence charged in the petition. Some courts have taken that view (Ency. of Plead. & Prac. vol. 5, p. 11), but no decision is cited where this court has done so, and we do not think that such a doctrine has any place in our liberal system of pleading. What the defendant says by such a plea, coupled with a general denial, as in this case, is that he is not guilty of the negligence charged; but that if he is, then that plaintiff by his or her own negligence contributed to the resulting injury, and for that reason cannot recover.

Before plaintiff can recover, she must show that her injury was caused by defendant's negligence. We copy verbatim her assignment of negligence, to wit:

"That her said sufferings, injuries, and disabilities were caused by no fault or neglect of her own, but were proximately and directly caused by the imprudence, want of skill, care, and caution, and by the gross, willful, wanton, and cruel negligence of the said railway company, its managers and employés, in the following particulars, to wit:

"First. In overcrowding its cars and coaches beyond their capacity, as aforesaid.

"Second. In bringing to bear upon its road and bridges, and especially upon bridge No. 26, a greater weight than they and it could bear.

"Third. In the old and rotten condition of the road and its bridges, and especially of bridge No. 26.

"Fourth. In the improper and faulty construction of its bridges, and especially of bridge No. 26.

"Fifth. In the want of proper and timely inspection of its road and bridges, and especially of bridge No. 26.

"Sixth. In the want of proper and timely repairs to its road and bridges, and especially to bridge No. 26.

"Seventh. In the want of a proper equipment of its train with the necessary tools, instruments, and appliances needful and useful in case of an emergency or wreck. In the want of suitable, proper, and sufficient accommodations and facilities for passenger traffic.

"Eighth. In not carrying a proper and sufficient supply of water in the reservoir on its locomotive, or in negligently allowing same to leak out. In not providing a supply of water for its locomotives and engines at proper, convenient, and suitable places.

"Ninth. In not timely relieving petitioner from her perilous condition aforesaid.

"Tenth. In allowing petitioner to remain in the woods all night without proper surgical and medical treatment and attention.

"Eleventh. In not quickly and speedily conveying petitioner to Vidalia or Natchez, where she could have obtained the care and attention of skilled physicians, surgeons, and nurses.

"Twelfth. In not timely providing the means of conveying petitioner from the place of accident to Vidalia or Natchez. In the want of proper care, prudence, caution, and skill in the management of its train and the handling of its passengers."

A railroad bridge should be so constructed as to sustain the weight of any train that may have to pass over it, hence the two grounds

of the overloading of the cars and of the deficiency of the bridge are in reality one and the same.

There can be no question whatever that the business of providing the excursionists with return transportation was most grossly and culpably mismanaged, but between that and the injury complained of there was no causal connection. It was the breaking down of the bridge that was the proximate cause of the injury. True, plaintiff would not have been injured if she had been provided with a seat, or even with standing room inside of the coach; but the failure to provide a seat, or even standing room, inside of the coach, on a cheap excursion, such as this one was, is not, as a matter of law, and is not shown as matter of fact to be, negligence such as, of itself alone, without the co-operation of any other or further negligence of the railway company, will give rise to a cause of action in behalf of an excursionist who is compelled thereby to ride on the platform, and, as a result of being there, is injured by an accident occurring through no fault of the railway company.

The absence of the necessary tools for use in case of a wreck, and the faulty condition of the locomotive, did not contribute to the accident; but, as the event showed, the absence of the ax usually carried by railways for just such emergency use, or the absence of some other equivalent tool, contributed directly to the protraction of plaintiff's sufferings. Had there been such an ax or other equivalent tool, plaintiff would have been extricated promptly, and would have been spared the three hours of torture. Plaintiff was released within a few minutes after an ax had been procured. Whether responsible or not for the collapse of the bridge, defendant is certainly responsible for this easily avoidable protraction of plaintiff's sufferings.

The failure to carry this ax or other equivalent tool was not negligence simply,

but was negligence of the worst sort. Ordinary common foresight would have suggested the doing so, let alone the high degree of foresight to which a railway company is held for the safety of its passengers. For the additional sufferings which she thus endured, unnecessarily, through defendant's gross and unmitigated fault, plaintiff is entitled to judgment, regardless of what may be the issue of the suit on the question of negligence in connection with the bridge. The amount of this judgment we shall not fix at this time, preferring to leave it to be fixed by the jury when it comes to pass upon the case as a whole.

Whether the breaking down of the bridge was due to the negligence of the defendant company is left an open question by the record. Defendant sought to offer evidence on that subject, but the court ruled that the evidence was inadmissible, because the defense of contributory negligence admitted the negligence with regard to the bridge.

Logically it did. Without there be negligence, there cannot be contributory negligence. Nor shall we say that in the light of the authorities elsewhere on the subject, and in the absence of any announcement from this court, our learned Brother of the lower court did not rule right from his standpoint; but, as indicated by what has already been said, the ruling cannot have the sanction of this court.

The two defenses, of denial of negligence and of allegation of contributory negligence, clash only in their verbal enunciation; in practice they do not. They depend upon two independent sets of facts; the one upon the conduct of defendant, and the other upon the conduct of plaintiff. On the trial of the case they do not cause confusion or complication, and do not embarrass the plaintiff in the presentation of his case; all he has to do is to produce before the court all the facts. Both are valid defenses, and there can be no good practical reason for compelling the de-

fendant to elect between them. However logical it might be, there is in practice no good reason for it; and, in addition to being unnecessary, it might, in a large number of cases, prove downright mischievous. Even in the full light of all the facts as produced on the trial, it is not always easy, as this court, to its chagrin, knows but too well, to determine whether the law's judgment in the case should be founded upon absence of negligence on the part of defendant, or presence of contributory negligence on the part of plaintiff. To compel the defendant to make this election in the uncertain light of the early dawn of the case, would be to put aside practical utility and justice for the sake of mere abstract, superficial consistency.

The case will therefore have to be remanded for the reception of evidence on the question of the negligence vel non of defendant in connection with the bridge. But the taking of evidence will be restricted to that single point, and the burden will not be on plaintiff to show the negligence, but on defendant to show the absence of it (Le Blanc v. Sweet, 107 La. 355, 31 South. 766, 90 Am. St. Rep. 803); and the defendant will have to be held liable in connection with said bridge, unless it can show that the bridge as originally constructed was as safe as the highest degree of practical care and skill could make a bridge of that class, and that, to the fullest extent that the highest degree of care and foresight could suggest, it was inspected for discovering and remedying any defects that might have developed in it from the operation of the road or other causes, and, in case the defect was latent in the material, then that the material was tested before being put in position. 6 Cyc. 617–619; Hutchinson on Carriers (2d Ed.) § 512a, p. 581; section 501, p. 567; Rapalje & Mack, Dig. vol. 6, p. 255, No. 137 et seq.; Nos. 162, 171; Louisville City Ry. Co. v. Weams, 8 Am. & Eng. Ry. Cas. 401; Ingalls v. Bills, 43 Am. Dec. 355; Bowen v. New York Cent. R. Co.,

72 Am. Dec. 532. In other words, for rebutting the presumption of negligence, the defendant will have to show that the defective condition of this bridge was due to some cause which, by the exercise of the highest degree of care and skill and foresight, it could not have guarded against.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and the case be remanded for further trial in accordance with the views herein expressed, with right to a jury; no further evidence to be taken, however, except on the sole point of the negligence vel non of the defendant in connection with the bridge; the damages, in the event defendant is found to have been negligent in that connection, to be for the entire case, but, in the contrary event, to be only for the additional sufferings and injury resulting to plaintiff from her not having been extricated from the wreckage as soon as might have been done had the train been equipped with the proper tools in prevision of such an emergency; the plaintiffs to pay the costs of this appeal.