(68 South. 824)

No. 20087.

BASEY et al. v. LOUISIANA RY. & NAVIGATION CO.

(May 24, 1915.)

*(Syllabus by Editorial Staff.)*

1. CARRIERS ⬅➔339—CARRIAGE OF PASSENGERS —CONTRIBUTORY NEGLIGENCE—WARNING BY CARRIER.

Where some of the passengers on a crowded train were riding in an open gondola car, which was part of the mixed accommodation train, because of the crowded condition of the cars furnished for passengers, it was the carrier's duty to warn them of the danger of riding in that car, if there was any special danger, and failure to give such warning renders the car-rier liable notwithstanding the passengers' negligence in riding in such a place.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1353; Dec. Dig. ⬅➔339.]

2. CARRIERS ⬅➔298 — CARRIAGE OF PASSENGERS—NEGLIGENCE—JOLT.

A severe jolt to a train carrying passengers, caused by the slackening of speed to avoid running over horses on the track, was unavoidable in the operation of the train and does not show negligence.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1192, 1205, 1206; Dec. Dig. ⬅➔298.]

3. CARRIERS ⬅➔296 — CARRIAGE OF PASSENGERS—NEGLIGENCE—EXTRA TRAVEL.

Where a carrier has reason to anticipate extra travel, and especially where such travel results from the carrier's own efforts, it is negligence not to provide extra accommodations sufficient to give all the passengers a seat, and thereby expose some of the passengers to the added danger of injury to which persons standing in the aisles are exposed.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1200–1203; Dec. Dig. ⬅➔296.]

4. DEATH ⬅➔76—ACTIONS FOR CAUSING—SUFFICIENCY OF EVIDENCE—CAUSE OF DEATH.

In an action against a passenger carrier for the death of plaintiff's son, evidence *held* not to show that the death resulted from an injury on defendant's train, received some time before, and not from tuberculosis.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 94; Dec. Dig. ⬅➔76.]

Appeal from Thirteenth Judicial District Court, Parish of Rapides; W. F. Blackman, Judge.

Action by Mrs. William Basey and husband against the Louisiana Railway & Navigation Company. Judgment for plaintiffs, and defendant appeals. Judgment set aside, and suit dismissed.

Edwin L. Lafargue, of Marksville, White & Thornton & Holloman, of Alexandria, and Wise, Randolph, Rendall & Freyer, of Shreveport, for appellant. J. H. Ducote and J. W. Joffrion, both of Marksville, and Blackman & Overton, of Alexandria, for appellees.

PROVOSTY, J. Mrs. Basey, aided and assisted by her husband, sues in damages for the sufferings and death of Wilson Scallan, a son of hers by a former marriage—a young

man in his twenty-second year. The evidence as a whole leads us to believe that he died of tuberculosis, but the contention is that his death was brought on by a blow he received in the side through the negligence of the defendant company while a passenger on one of its trains. The negligence is alleged to have consisted in that, although the defendant company knew, or ought to have known, that, owing to certain advertisements it had caused to be made, there would be that day a large increase in the number of passengers to be carried, it failed to provide additional accommodation; so that the overcrowded condition of the train forced the young man and others to ride standing in an open gondola, or coal, car, where he received the fatal injury by being thrown off his balance by a violent jerk of the train and precipitated against and upon a square post which served as a support for the side of the coal car.

The defendant company denies that there was any necessity for the young man to ride in the coal car or in any other unsafe place on the train, denies that he was otherwise injured than by a trifling scratch on the hand, avers that he died of tuberculosis, and denies that his death was brought on by any injury he may have received on the occasion in question.

The train was the regular train for that day. It consisted of freight cars and one passenger coach and a baggage car. This baggage car was an ordinary box car which had been converted into a baggage and general utility car by the opening of windows and end doors in it. The gondola car in question was the rearmost car of the train. Next to it, in the direction of the locomotive, was the passenger coach; then came the freight car converted into a baggage and general utility car; then the line of freight cars; and finally the locomotive.

There was to be on that day, the 14th of May, 1910, and the next, an aviation exhibition in the city of Alexandria, and the defendant company had advertised the event along its line and announced a reduced passenger rate and an excursion for those who should desire to attend. The train was a local, leaving Naples, in Avoyelles parish, in the morning, and going to Alexandria, a distance of 52 miles. The seating capacity of the coach was about 60, and there were two cushioned benches in the baggage car about 10 feet long. The passengers on the entire trip numbered 127. How many of these had already gotten off or had already come on board, at the time the jolt occurred from which the alleged injury is said to have been received, is uncertain. The distance from Hessmer, where plaintiff's son boarded the train, to Alexandria, is not stated; but, the number of stations between Naples and Hessmer being the same as between Hessmer and Alexandria, the probability is that Hessmer is halfway between the two termini, and that therefore the distance between it and Alexandria is 26 miles.

There were still vacant seats in the coach when the train reached Hessmer, and plaintiff's son secured one. But when the train reached Echo, the second station from Hessmer, a crowd came aboard, among whom were ladies, and the young man gave up his seat. It is contended that he was ordered by the conductor to do so, and also to go into the baggage car; but the conductor denies this, and there is no other evidence of it but the halting testimony of one witness, A. M. Fontane, and that of another, Cyriaque Ducote, who admits he did not understand English, in which language the conductor spoke. One other witness, who testified to having given up his seat to the ladies when this crowd came on board, says that he did so because he preferred it to seeing the ladies stand; and he does not say that he was forced to leave the coach for the box car, but that he did so of his own free will.

Of the 127 passengers, one of them, C. W. Wright, was the bridge inspector of the defendant company, who stood at the rear end

of the coal car in order to view the bridges as he passed over them; and another, F. E. Dearman, was his friend, who stood with him for the sake of his company. The other 124 had not yet all boarded the train at the time of the alleged accident; for the testimony is to the effect that passengers kept coming on board at every station. But assuming that none of those who had come on board that morning had left, and that all who came on board subsequently to the alleged accident were already on board, the whole number would have been 124; and we do not see that that number of persons could not have remained on the coach and the baggage car without the necessity of any one of them going into the coal car. The evidence shows, however, we think, that after the young man had given up his seat he could not have secured another seat.

While this is so, the evidence leaves it doubtful whether the going into the coal car was not more for the fun of it than from any actual necessity or even convenience. The son of plaintiff was with a crowd of other young men, most of them from the same neighborhood, and the trip was for pleasure, and all were in the spirit of having a good time. Some even climbed to the top of the baggage car. They were all very gay. For amusement they pushed and shoved each other about in horse play, and picked up pieces of coal from the floor of the coal car and threw them at the telegraph poles and whatever else appeared to be an inviting target as they went along.

It was not while so engaged, however, that the young man was injured, but while he stood leaning against the side of the car, and we have no reason to believe that he was in greater danger of being thrown down by a jolt of the train while standing there than he would have been if standing in the baggage car or even in the coach.

[1] Moreover, as the day was excessively warm, and the inside of the coach and baggage car was more or less uncomfortably crowded, there was some reason for these young men having recourse to this open air riding, and, if there was any serious danger in it, we think the duty rested upon the carrier, in fulfillment of its obligation to carry them safely, to give them more significant or pointed warning than was done of the danger. True, the conductor says that he told some of them that they should not go there; but nothing shows that this information reached plaintiff's son, and the warning, if such it was, must have been of the most perfunctory kind, since the conductor admits that he collected fares from some of them while they were in this coal car, and he says nothing of his having notified them while so doing that they should not ride in there or that there was any greater danger in their doing so than in riding standing in the coach or in the baggage car; and we think that if such greater danger really existed, and the young men appeared to be unaware of it, it was the legal duty of the conductor to give them serious warning while collecting these fares. Under certain circumstances, it is the duty of the carrier to protect the passenger against his own negligence, under penalty of the failure to do so being regarded as the proximate cause of a resulting accident. 6 Cyc. 641. And all the more imperative is this duty in a case where it has been the overcrowding of the train, resulting from the mismanagement of the carrier, that has forced the passenger to occupy the dangerous position. Jackson v. Natchez & W. Ry. Co., 114 La. 982, 38 South. 701, 70 L. R. A. 294, 108 Am. St. Rep. 366.

[2, 3] The evidence leaves no doubt that there was a severe jolt. It was caused by the sudden reduction of the speed of the train, from about 20 miles an hour to a rate not fixed, in order to avoid running over some horses that had got on the track. But an

occurrence of that kind is unavoidable in the operation of a train, and therefore does not constitute negligence on the part of the carrier. Hence, if it be true that the young man was injured by this jolt, the negligence of the defendant company will have to be sought for elsewhere. It can be found, we think, in the failure to provide sufficient accommodation for the passengers. True, the train in question was the regular train, and it had the usual accommodation; but the company had made advertisements and reduced its rate for obtaining a greater number of passengers, and should have foreseen that there would be an increased number, and should have made provision accordingly. It is the duty of a railroad company, when it has had notice of an unusual number of passengers, and especially when it has been itself instrumental in inducing such extraordinary travel over its line, to provide reasonable seating accommodations for all passengers to whom it sells tickets; and it is liable for an injury to a passenger resulting from its failure to do so. Trumbull v. Erickson, 97 Fed. 891, 38 C. C. A. 536. See, also, Reem v. St. Paul City Ry. Co., 77 Minn. 503, 80 N. W. 638, 778. A carrier which furnishes an insufficient number of cars, thereby compelling passengers to stand in the aisles and on the platforms, is guilty of negligence. Graham v. McNiell, 20 Wash. 466, 55 Pac. 631, 43 L. R. A. 300, 72 Am. St. Rep. 121; International & G. N. R. Co. v. Williams, 20 Tex. Civ. App. 587, 50 S. W. 732. For the same reason that it is negligence on the part of a passenger to stand unnecessarily when a seat has been provided for him, thereby increasing the danger of being injured, it is negligence on the part of the carrier not to provide a seat for him, when it should have foreseen that the seat would be required, and that therefore his danger of being injured would be increased if the seat were not provided.

[4] The evidence, however, leaves entirely too uncertain whether the young man's subsequent illness, and his death which occurred ten months later, can have been caused by any injury received on the occasion in question for any judgment to be rendered against the defendant company.

Two witnesses, Xavier Nucere and Fulgence Villemarette, testified to the manner in which plaintiff's son, Wilson Scallan, received his injury. Xavier Nucere testified as follows:

"Wilson Scallan was in the gondola car, when all at once there was a jerk which hurled him on the side of the gondola car. He was about three feet from the end of the car. * * * He fell on his left side, and his whole side went up against the front end of the car. He was thrown against the front part of the car. Q. Do you know the place Scallan pointed out to you where he was hurt in the side? A. Yes, sir; it was here on the side. (Witness indicates a point at the border of the lower rib on the left side, anteriorly.)"

This witness was standing on the platform of the coach. The other witness to the manner of the alleged injury, Fulgence Villemarette, was in the gondola car leaning on its side, slightly in the rear of Scallan. He says:

"Wilson Scallan was thrown with force from his feet by the jolt and struck against a square post inside the wall of the car. When he fell, I was by his side, and he remained doubled up, and I thought that he had been hurt from the manner he was acting, and I went to him and asked him if he had received any injury, and helped him to arise. Q. When you asked him if he had received any injury, did he answer? A. Yes, sir; he made a motion of his head indicating that he had been. He was thrown kind of head foremost, but sideways to his left side. (Witness indicates that he was struck in the region of the thorax, indicating the waist line.) Q. Did it seem to you that he could not speak and therefore had to answer by a nod of his head? A. It looked like that, since he did not answer me. Q. When you assisted him, where did you assist him to go? A. He wanted to cross over to go to the platform of the coach. Q. He did go to the platform of the coach? A. Yes, sir. Q. When he got on the rear platform of the coach after your assistance, what did you do with him, and what did he do? A. Nothing. I stood there a little while, and then left and did not pay any more attention. He sat down on the rear platform of the coach. Q. When he sat down on the platform of the coach right after receiving this injury, did he

seem to be suffering from an injury? A. Yes, he appeared to be."

Xavier Nucere corroborates this witness in the latter's statement of his having assisted Scallan to arise and to go to the platform of the coach. These two witnesses are neighbors of the plaintiff. Two other witnesses, F. E. Dearman, who was in the gondola car at the time the jolt in question occurred, and E. J. Normand, who was standing on the rear platform of the coach, testify as follows: F. E. Dearman says that he stood at the rear end of the gondola car; that there were 15 to 20 persons in the car, and that one of them might have fallen without his seeing him, but that he did not see any one fall, and did not hear of any one having been hurt, and did not see any one attended to by anybody as if hurt, and saw no one being assisted out of the car. Attention is called by plaintiff to the fact that this witness was at one time in the employ of the defendant company, from August, 1910, to August, 1911, part of the time as flagman and part of the time as expressman; but these dates show that he was not an employé of defendant either at the date of the alleged accident or at the time of giving his testimony. At the time of testifying, he was in the employ of the Southern Pacific Railroad.

The other witness, E. J. Normand, is a farmer and a neighbor of the plaintiff, but is also an employé of the defendant company for carrying the mail from the railroad to the post office at night for which he is paid $10 a month. He stood on the rear platform of the coach close to the front end of the gondola car where Scallan was. He testified as follows:

"I did not see any one fall, but, soon after the jerk was given by the train, I saw Wilson Scallan. He was got up, but I did not see him fall at all, and when he got up he just took his hand like this (looks at his hand), and I saw his hand was bleeding, and I asked him what was the matter, and he said, 'I got hurt in my hand.' He got his pocket handkerchief and wrapped the blood up, and put it back (the handkerchief) on his hand, and then took it off, and the blood stopped. Q. Well, when you saw him after he had got up, what was it about his appearance that made you ask him if he had got hurt? A. Because I saw the blood on his hand. Q. Did not he also look to you like he was suffering? A. No, sir; I did not pay any attention to that. Q. You did not notice whether he was suffering or not? A. No, he was suffering over his hand, I know, a little, because he raised up his hand like that, and looked where his hand was cut a little, so he got his handkerchief, and put it on the blood to stop it bleeding. Q. He may have been suffering, and showed that he was suffering from something else; but, as I understand your testimony, you did not pay any attention? A. I did not pay any attention to anything else, but he looked at the blood on his hand like that, and I asked him if he had got hurt, and he said, 'Yes, look at my hand.' * * * Q. Did he say anything about being hurt anywhere else at that time? A. No, sir; not at that time, not that I heard. Q. When you had that conversation, where was he, and where were you? A. I was on the platform right close to the gondola car. Q. Where was he when he was talking to you? A. In the gondola car. * * * After that happened he just come out from the coal car and went on the platform, and just a little while after that I left him there. Q. On reaching the platform, did he sit or stand? A. I don't know. I don't remember. Q. And you don't remember whether some one assisted him from the coal car onto the passenger platform? A. I don't remember."

The conductor testified as follows:

"Q. After this jolt, what did you do? A. I didn't do anything. The train just slowed down and proceeded, and I walked back through the coach to see whether anybody was shook up or anything. I went back to the rear end of the train. Q. Did you go back to the rear platform? A. I did. Q. Did anybody make any complaint as to being hurt? A. None whatever. Q. What was the average height of the sides of the gondola car? A. About four feet."

The order of the stations was: Hessmer, Belledeau, Echo, Magda, Richland, Whittington, Latanier, Arno, and Alexandria. These stations were not far apart, as the distance between Hessmer and Alexandria was, as already stated, only about 26 miles. The conductor says that the jolt occurred a mile or two before Arno was reached. The witness Xavier Nucere testified at first that it had occurred before Echo was reached, and afterwards corrected this statement and said it

was between Richland and Whittington. The witness Teska Guillot was asked, "Between what stations was this that you first saw him after he was injured?" and answered:

"A. I saw him just before they made the stop at Latanier. He came into the coach and told me he had got hurt. He told me he was suffering."

According to this testimony, Scallan could not have remained long seated on the platform of the coach.

Cyriaque Ducote testified that, after they got off of the train at Alexandria, Scallan told him he had been very badly hurt on the train, and asked him to go and see a doctor with him; but that he lost Scallan in the crowd, and did not see him any more.

A. M. Fontane testified that, right after they got off the train at Alexandria, Scallan told them that he had got hurt on the train, and asked Cyriaque Ducote to go to the drug store with him.

G. E. Morrow testified that about 2 o'clock in the afternoon of that day he met Scallan on the street in Alexandria, and the latter told him he had been injured on the train, and asked his advice as to what to do about it; and that he advised him to go and see a lawyer, and that they went together to the office of Mr. Overton, the present counsel in the case; that Mr. Overton was out, but that they met him on the street about two blocks from the office, and that he would not take the case because he said, "We don't take a railroad case unless a man would lose an eye or an arm or a leg, or something serious," and so they left him, and he (witness) advised Scallan to see a physician, and then he could see another lawyer, and he said he would not see any physician here, but would go back home and see another lawyer, and he (witness) referred him to his brother, W. A. Morrow; that he and Scallan were together about an hour; and that, while Scallan complained of having been hurt, he (witness) could not know whether it was true or not.

Xavier Nucere met Scallan on the street that day about an hour before sundown, and asked him how he felt, and Scallan answered he felt sick.

The only other witness who testified to having seen Scallan in Alexandria was L. O. Gremillon, at whose house he spent the night, who says that on reaching home that night at 9 o'clock he was told that Scallan had received an injury and was in bed, and he found him in bed, and was told by him that he was suffering from an injury in his side; that Scallan left the next morning by the early train for Hessmer.

All this evidence is not very satisfactory as to the gravity of the alleged injury. While the jolt of the train is shown to have been severe enough to throw a standing person off of his balance, Scallan seems to have been the only one of the large number who were standing who was thus thrown; and neither his fall nor the effect of it upon him would seem to have been severe enough to have caused a commotion among the bystanders, or even apparently to have attracted the attention of more than three of them. The hurt was not severe enough to prevent him from being on his feet all that day. His request to Cyriaque Ducote to go with him to a drug store, or to consult a doctor (whichever it was), must have been lightly spoken and lightly received, for it was not followed up. Ducote says that he lost him in the crowd; and we find that when he and Morrow, some hours later, were going about in search of a lawyer, he had not yet consulted a doctor; and nothing shows that he had gone to a drug store. To Normand he complained only of the injury to his hand.

Apart from the testimony of Nucere and Villemarette that they saw Scallan fall against the side of the car, the entire evidence to support plaintiff's case with regard to this injury comes out of the mouth of the young man himself, consists of what he told his doctors and others of the pains he had in

his side; and suspicion attaches to it, for the idea of recovering damages from the railroad company, whether originating with him or inspired by Morrow, very soon began to be entertained by him; and from that moment he had a pecuniary interest—one which, in all likelihood, offered to his mind the prospect of a fortune—to locate an injury in his side, and to magnify it.

Mr. G. E. Morrow, with whom he had gone while in Alexandria to consult a lawyer, advised him to consult a physician, and then to employ a lawyer; and recommended his brother, Mr. W. A. Morrow, of Marksville. This was on the 14th. On the 16th, he consulted Dr. Poret; and this doctor, after having examined him, sent him to Dr. Saucier, who also examined him. These doctors saw no marks, or indications, of any kind, of any injury. No abrasion, no bruise, no discoloration, no redness, no inflammation. But, accepting as true the statements of the patient, that he had received a severe blow in the side and was suffering from the effects of it, they gave him the following certificates:

"Hessmer, La., May 16, 1910. This is to certify that I have examined Wilson Scallan, of Hessmer, La., and I found him suffering with internal injuries, caused by a fall on the Valley train, on May 14, 1910.  E. A. Poret, M. D."

"Marksville, La., May 17, 1910. This is to certify that I have examined Wilson H. Scallan, of Hessmer, La., and have found rather a severe bruise on his left thorax anteriorly, and in the region of the left lobe of the liver; also found a left-sided varicocele. His trouble, he states, was caused by a fall on the Valley Railroad in May 1910.  M. E. Saucier, M. D."

Reinforced by these certificates, Scallan went to Mr. W. A. Morrow (or perhaps had been required by Mr. Morrow to go first and consult the doctors), and Mr. Morrow wrote to the claim agent of the defendant company the following letter:

"Dear Sir:  Last Saturday, the 14th inst., Mr. Wilson Scallan of Hessmer was a passenger on one of your special excursion trains going to Alexandria, and while said train was going twenty-five or thirty miles per hour, Mr. Scallan was walking to the cooler to drink, the train stopped suddenly and threw him with a terrific force on the end of an arm of one of the seats, causing him great internal injury.  He also bruised very badly one of his hands and knees.

"He has since been attended by two reputable physicians, who certify that his injuries caused by that fall may prove permanent. He has suffered considerably and is now a sick man.  We consider the injury has caused him damages to the extent of $2,500.  I am writing this letter as an amicable demand for the amount above stated to your company, and I shall await an early reply from you before suit is filed for said amount.  Let me hear from you at once.

"Yours truly,           Wm. A. Morrow."

The defendant company would not entertain this demand, and later on Mr. Morrow refused to go on with the case, and Scallan also, so far as appears, relinquished all idea of bringing suit, for he never did.  And it was only after his death, after the positive evidence of what he had really died of had been buried with him and was no longer available, that this suit was brought.  And plaintiff produces experts to testify that such a thing is possible as that a person should receive severe internal injury from a blow or shock, without there being any outward indications; that such a thing is possible as that by this blow a pus or abscess formation might have been caused, which might have emptied into the lung and caused death. And Dr. Poret, who gave one of the above-transcribed certificates, and who was the family physician, testified that it was his opinion that nothing else than this injury had caused Scallan's death.  And neighbors of the young man testified to his having repeatedly told them that he suffered constantly from this pain in his side, and to his having been sick more or less all the time after having received this injury, and gradually lost flesh and strength until his taking to his bed and dying.  One witness who had dressed the dead body says that when he removed the plaster from his side the place was "greenish black"; that there was a "lump about four fingers long, and I suppose two fingers wide"; and that Scallan while alive

had told him that "it was that lump (indicating his left side) that would kill him."

Plaintiff herself testified that Scallan suffered all the time and complained every day; that from the time he returned from the Alexandria trip she saw him "dry up, decrease, and suffering"; that the last month before he died she noticed the place in his side was very red; that she made applications to the spot of preparations of her own, and also of iodine prescribed by the physician; that sometimes he would complain in his sleep. "He would jump and wake up, and I would ask him, 'What is the matter?' and he would say, 'I am suffering from my side'"; that she noticed discoloration at the spot about three or four weeks after the accident.

Dr. Poret testified: That Scallan came to him for treatment a few days after the Alexandria trip. That he examined the side and saw no marks at that time nor later, but that a few weeks before he died he observed "a slight discoloration, red and a little bit swollen, very slight." That this might have been caused by plasters or poultices. That at this first examination the spot, which was between the eighth and ninth ribs, was tender and very sensitive under pressure, but that, naturally, he could know this only from what the patient told him. That at this place "you first have the pleura and then the lower lobe of the lung, and the spleen also right back of it." That for eight or ten months before this accident he had been treating him for chronic malaria. That "about seven years ago he was a plump, good size fellow. Q. How long ago did he begin to become sickly? A. Well, about ten or twelve months before he was hurt, that is, about four years ago. (N. B. The case was being tried three years after the death of the young man.) Q. Then he began to grow weak and sickly? A. Well, he was sick at the time with fever, malaria." That from the time of the accident the young man would come to see him about every two or three weeks:

"What symptoms did you observe? A. Well, there was pain in breathing, rapid breathing and very sensitive, and there was pain also on pressure, and he had a slight fever, if I remember correctly. I had to give him opiates."

That these symptoms continued down to the last time he saw him, which was about three weeks before his death, and became more aggravated as time went on.

"Q. When he called on you on May 16th, was he a man of normal weight for his height? A. Well, yes, of course like a man who had had malarial fever for several months before. Q. I made note that you stated that emaciation had set in, when was that? A. Two or three months after he was hurt. Q. Isn't it a fact that emaciation, fever, and labored breathing are symptoms that are more characteristic of tuberculosis than they are of an internal tumor? A. It is, in a way; yes, sir. Q. Didn't you tell me that when you were treating this boy you had looked into his family history and found that his father, or some member of his family, was consumptive? A. No, sir; I told you that I heard that his father had died of consumption, but that I did not know it personally. Q. But that on examination of the boy's history that that had come to your knowledge? A. Yes, sir."

As already stated, Dr. Poret expressed the opinion that the young man died as the result of this blow received in the side, which caused a pus formation. He refused to be positive, however, that the young man had not been consumptive, and that his wasting away and death had not been caused simply by consumption. But he says that he examined him for consumption, and did not observe the indications of it.

No post mortem examination was made.

Dr. Saucier testified as follows:

"Scallan came to my office on the 17th day of May with a verbal request from Dr. Poret, would I examine him. I was at home at the time—it was raining, but I went down to the office, and I asked him the history of the case and how it happened, and he said he was riding on the train; that he had come to Alexandria on an excursion train; and that he had gotten up from his seat to go to the cooler and get water; and that while going to get water the train came to a sudden stop and he was thrown on the side of the seat. Now, I made the man strip, take off his coat and shirt, and examined

him by palpation, percussion, etc., and the evidence that he gave under examination were those of suffering, apparently of a man suffering from pain when you touched him. There was no discoloration of any kind or character, that I can remember. There were no fractured ribs. I sent a report of the result of my examination to Dr. Poret, stating that I found a rather severe bruise in the region of the left lobe of the liver, anteriorly, and made comment of some other things I found on patient that have no connection with this case. The explanation I wish to make of this report is this: The report that I made states that the bruise was a rather severe bruise, and it was written in that way to offset the opinion in my mind that Dr. Poret and the patient had that he had been seriously injured, because my recollection of it was that he had no bruise externally, no fracture or bruise of any kind, although he acted pain, and made out as if he were suffering under the examination. At the time I must have thought that he was suffering. Q. (by the Court) You say he made out as if he was suffering—you don't mean to convey the idea that he was trying to deceive you? A. At this time I don't pretend to say whether he was or not. * * * Q. Did you ever, at any subsequent time, make a further examination of Mr. Scallan's condition? A. Yes, sir; I saw him again on the 27th day of June, 1910, as my books show. Q. Please state as well as you recall why he came to you on that occasion? A. On the occasion of his second visit to my office I don't remember whether he had any definite object or not, but he must have come because he felt sick. At any rate, I found him badly fallen off, markedly fallen off in weight and appearance, and I again examined him. Q. Please state the result of your examination. A. The result of the second examination showed plainly that the man was suffering from a rather advanced stage of consumption in both lungs. Q. Please state what developments, if any, were shown on this second examination concerning the injury to his side about which he had complained. A. I remember nothing having been said about the side at that time; my mind is a blank on that point."

Plaintiff's learned counsel seek to discredit this witness by showing that the prescription given on that occasion was not for consumption, but was tincture of iodine for application to the side and quinine and a tonic for malaria; but the doctor explains that the purpose was to get rid first of the malaria, and that he told the patient to come back, and he never did; that the local application of tincture of iodine is often used in cases where the pleura is involved.

Dr. Regard was consulted by the young man on November 10, 1910. He testified that from his diagnosis of the case he is positive that the malady of the young man was consumption. He does not remember that when he was consulted anything was said about any internal injury. He is positive nothing was said about it.

This witness was the local surgeon of the defendant company, and also president of the Bank of Mansura. He was sought to be discredited by the testimony of the plaintiff herself, who testified that she accompanied her son to his office, and that her son did tell him that he had come to consult him about the pain in his side.

Some neighbors of the plaintiff testified that the young man had been ailing and unable to do much work for some time before his alleged injury, and that his father had died of consumption, in the very same way that he had. The greater number of witnesses testified, however, to the very opposite, namely: That, whereas up to the time of the alleged injury he had been well and strong, he had rapidly declined from that time on and apparently suffering all the time, and that his father had not died of consumption, but of pneumonia. All this testimony as to the suffering of the young man consists mainly, however, of what he himself said; and the fact that he himself abandoned all idea of bringing suit against the defendant company is very significant. Had he brought the suit, a very simple expert examination would have conclusively determined the nature of his injury.

The probative force which his statements as to his sufferings derive from their contemporaneousness is much detracted from by the fact that when he began making them he had a strong inducement to do so as going to confirm the claim he was making, or about to make, for an amount of damages which to him would have appeared to be a fortune; and is further detracted from by the fact that, in the letter which his lawyer wrote to

the claim agent of the defendant company, the manner of the injury is 'stated to have been by falling upon a seat in the coach 'while going to the water cooler for a drink of water— a statement, which, by the way, he appears to have made to Dr. Saucier as well, and which, if made, was certainly false, and would go to show him possessed of a designing mind and not much hampered by any sense of obligation to speak only the truth.

As already stated, the true cause of the young man's death is left by the evidence too much in doubt for a judgment to be rendered against the defendant company.

The judgment appealed from is set aside, and the suit is dismissed; the plaintiff to pay the costs in both courts.