No. 3916

Second Circuit

MARTIN v. INTERURBAN TRANSPORTATION COMPANY, INC.

(December 23, 1930. Opinion and Decree.)

J. B. Dawkins, of Monroe, attorney for plaintiff, appellee.

Hawthorne, Stafford & Pitts, of Alexandria, attorneys for defendant, appellant.

ODOM, J.  The defendant owns and operates motorbusses for the carrying of passengers for hire over the highways of this state.  On July 31, 1929, plaintiff took passage on one of its busses at Bosco, in Ouachita parish, and paid the usual fare to Monroe.  Between Bosco and Monroe the bus ran off the road into a shallow ditch, causing plaintiff to be thrown from her seat against the door, and she was injured. She prosecutes this suit for damages.

Plaintiff alleged that her injuries resulted solely from the fault and negligence of the defendant company, its agents and employees, in operating a passenger vehicle which was "defectively equipped and negligently and carelessly operated."

Defendant in answer admitted that plaintiff was a passenger for hire on one of its busses and that the bus "met with an accident" causing the right front wheel to go into the ditch on the right-hand side of the road, but denied all of plaintiff's other allegations.

Its defense is that it was guilty of no fault or negligence in the operation of the bus; that the driver lost control because the tie rod, which is part of the steering mechanism, suddenly and unexpectedly broke while the bus was on the road go-

ing not over 25 miles an hour; that, when the driver realized he was losing control, he applied the brakes and did everything in his power to hold the bus on the road, but could not do so; that the accident was wholly unavoidable; that the tie rod was made of steel and was 1¼ inches in diameter and without visible defects, and, in the alternative, if it should be held that the rod was defective, the defect was latent and not such as could be discovered by the most careful inspection; that the steering mechanism and the tie rod itself were inspected by competent mechanics before the bus left on this trip and was found to be in perfect condition so far as could be seen by proper inspection.

From a judgment for plaintiff, defendant appealed.

## OPINION

Defendant is a common carrier of passengers for hire, and plaintiff was a passenger on one of its busses. It owed to her the duty of furnishing her safe transportation to the end of her journey. In this particular respect it failed, for she was injured while in the bus on the way.

But it does not necessarily follow as a matter of law that defendant is liable to her in damages for these injuries. Common carriers of passengers owe to them the duty of exercising the highest · degree of care for their safe transport that is reasonable and consistent with the operation and conduct of such business. But they are not insurers of their safety. Unless a carrier does something it should not do or fails to do something it should do, or, in other words, unless it is guilty of some fault, there can be no recovery for injuries sustained by one of its passengers. Carriers owe to their passengers the duty of furnishing for them sound and safe vehicles for their carriage, and this carries with it

the obligation of using the highest degree of care, not only of selecting safe vehicles, but of constantly and vigilantly inspecting them and seeing that they are kept in repair and safe.

In suits by passengers against carriers for personal injuries sustained during passage, when the passenger proves that he was injured and that the injuries resulted from an accident due to the failure in any respect of the vehicle or means of transportation, a presumption of negligence arises against the carrier, and the burden rests upon it to show why it failed in its duty of safe transportation.

In the case at bar, the defendant showed why it failed to safely carry plaintiff to the end of her journey and why she was injured on the way. It showed that its vehicle or machinery failed; that the tie rod, a part of the steering mechanism, suddenly and unexpectedly broke; that the driver could not hold the bus on the road and it went into the ditch, causing a sudden jar or jolt which threw plaintiff from her seat against the door with such force that she was injured.

But defendant did not thereby discharge its burden. It was necessary for it to show more than that. The fact that the tie rod, a cylindrical steel bar 1¼ inches in diameter broke, not from contact with any other object or from any unusual strain, but while the bus was running at a moderate rate of speed on a graveled highway, creates the presumption that it was in some way defective.

The testimony amply warrants the conclusion that this rod was defective, but that fact alone does not necessarily fasten liability on defendant. But if the defect was known to defendant, or if it could have been discovered by such inspection as

it was defendant's duty to make, then defendant is liable.

The defendant operates bus lines to various points in the state with Alexandria as headquarters, from which point the busses leave in the morning and to which they return at the end of the trip. When a trip is completed, the vehicle is carried to a general garage, where it is washed clean underneath with a steam washing machine, and it is inspected. The testimony shows that this particular bus was washed and inspected before it was taken out on the morning of the day on which this accident and injury took place; the inspection being made by Mr. Franklin, an experienced and competent mechanic, with the assistance of Mr. Deckert, another mechanic. The front end of the bus, after being cleaned, was jacked up, and Franklin went under it, looked at the tie rod, took hold of it, shook it as well as the wheels to see if all connections were in place and tight, and found that they were. He saw no defect in the tie rod. Deckert got into the bus while Franklin was inspecting the steering mechanism, operated the steering rod while the wheels were off the floor, and it was found that the entire machinery worked perfectly. It is shown that Franklin is an expert mechanic, and that it was his special duty to make these daily inspections, and that he had for a number of years been employed by defendant and other corporations engaged in the same line to do this kind of work. Franklin and other expert mechanics employed by motor transfer companies testified that the method of inspection practiced by defendant and made on this occasion was the same as used by others engaged in the same line of business.

It is not contended that Franklin did not make the inspection which he says he did, nor is it claimed that there was any defect in the tie rod which could have been discovered with the natural eye. As a matter of fact, there seems to have been no crack or visible flaw in the rod. The break was clean and new. The rod itself was new, having been used only sixty days, and ordinarily such rods last indefinitely; the mechanics saying that they rarely ever break, but that they sometimes do and for reasons hard to explain. The rod was manufactured by the White Motor Company, a manufacturer of standard, high-grade motorbusses and parts used throughout the country.

The rod broke or came in two while the bus was on the graveled road, running about 25 miles an hour, without coming in contact with any other object and without any sudden jar. It is suggested by counsel for plaintiff that probably the driver lost control and the rod broke as the bus went off the road, but the testimony shows otherwise. The driver says that as he was driving along on a slight curve he felt something about the steering mechanism give way, saw he could not guide the vehicle, and at once warned the passengers to hold to their seats as he was likely to run off the road. Two of the passengers testified, touching this point, each saying that the driver shouted a warning before the bus left the road, and their testimony is not contradicted.

Just why this rod broke or came in two as it did the mechanics could not say definitely. They all said that such rods seldom break, but that they sometimes do and without any apparent cause. They advance two theories—one that it may have been rendered defective by improper case hardening at the factory; that it sometimes happens, though not often, in the process of tempering or hardening one section or

portion of the rod is made extremely hard, brittle, and easily broken so that ordinary jolting on graveled roads will cause them to snap in two. The other is that the metal may have become "crystallized" or hard and brittle due to constant vibrations.

Mr. N. M. James, who operates the "James Machine Works" at Monroe, and repairs machinery of all kinds, was told the circumstances of this break and asked what, in his opinion, caused it. He said: "Well, the most common theory is what is known as crystallization of metal." On being asked what causes crystallization of a tie rod, he said:

"Well, there are two general things that cause crystallization in metals. One is being subjected to heat and cold several times and another is being subjected to high rate of vibration or rapid rate of being vibrated, subjected to a high-pitch vibration."

He said it was not likely that a tie rod or parts of it would form into crystals unless the connecting joints were loose. From this it is argued that there would have been no crystallization unless the connecting joints had been loose and that an inspection would have shown that they were loose. But the testimony of Franklin shows that they were not.

We quote further from Mr. James' testimony as follows:

"Q. Ordinarily you don't have very many broken tie rods, do you?
"A. No sir, we run across some that are broken but it is not as a result of wear.
"Q. It is the result of a lick or blow usually?
"A. Well, we find some that are broken that apparently there is no cause for, they haven't been hit.
"Q. And you can't see any reason for it?
"A. Just breaks."

The testimony all shows that a defect in metal caused by crystallization or hardening cannot be detected by ordinary inspection, that a mechanic cannot tell by looking at a piece of metal whether it is defective in that respect or not, and that such defects are latent. So that, conceding that the tie rod was defective in that it was hard and brittle at the point where it broke due to improper case hardening at the factory or that it had become crystallized due to excessive vibrations resulting from use, it is manifest that the defect was latent.

Common carriers are not liable for injuries to their passengers resulting from accidents due to latent defects in their machinery. Jackson et al. v. Natchez & W. Ry. Co., 114 La. 981, 38 So. 701, 70 L. R. A. 294, 108 Am. St. Rep. 366.

"The duty of the carrier as to furnishing machinery and appliances originally safe, suitable, and adequate is discharged by a purchase thereof from a competent and reputable manufacturer and an inspection to detect defects discoverable by any tests which the highest degree of care and prudence can suggest, and hence it will not be liable for injuries resulting from hidden defects which could not be discovered and provided against in the exercise of such care and prudence." 10 Corpus Juris, p. 954, sec. 1373.

The suggestion is made that it was the duty of defendant in making the inspection to go further than to look at the rod for defects; that the rod should have been taken loose from the other machinery and its strength tested. We do not think so.

Defendant made use of the best and most approved machinery and appliances, such as are in general use and found to be safe. The rod was manufactured by the White Motor Company, a standard manufacturer of such appliances. It kept its

machinery up to date. About sixty days previous to this accident the manufacturers ·directed that their busses be equipped with steering devices of recent manufacture and different from those formerly used, and the new mechanism was installed in this bus. The machinery was not only in common use, but it was standard, and there was nothing to suggest that the method of construction was inherently negligent or dangerous. Under such circumstances we do not think it was defendant's duty to test the strength of the rod before using it. It would have been going too far to say that a carrier, in order to discharge its duty to inspect, must dismantle its machinery before using it and test each part for strength when such machinery is new and of standard manufacture.

The method of inspection adopted by this defendant is the same as that used by carriers generally, and we think the inspection made in this case was sufficient, and that, in making the inspection as it did, defendant discharged its duty. The breaking of the rod was purely accidental and could not be foreseen.

A carrier is liable for injuries to its passengers only in case it is negligent in the performance of some duty imposed upon it. Frelsen v. Sou. Pac. Co., 42 La. Ann. 673, 7 So. 800; McGinn v. New Orleans R. & Light Co., 118 La. 811, 43 So. 450, 13 L. R. A. (N. S.) 601; Reems v. New Orleans G. N. R. Co., 126 La. 511, 52 So. 681; Blashfield's Encyclopedia on Automobile Law, vol. 1, p. 280; Huddy on Automobiles, p. 194.

Counsel for plaintiff cites article 2754 of the Civil Code, which provides that "carriers and watermen are liable for the loss or damage of the things entrusted to their care, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events," and argues that carriers of passengers, in order to escape liability for their injuries, must make proof similar to that necessary in order to escape liability for loss or damage to goods intrusted to their care. But our Supreme Court has in several cases stated that the above-cited article refers to things and not to persons. Patton v. Pickles, 50 La. Ann. 857, 24 So. 290; Kennon v. V. S. & P. R. Co., 51 La. Ann. 1599, 26 So. 466; Aiken v. Sou. Pac. Co., 104 La. 157, 29 So. 1.

In McGinn v. New Orleans Railway & Light Co., supra, it was held, to quote the syllabus written by the court:

"The rigor of the rule announced in article 2754 of the Civil Code touching the burden of proof of carriers is to some degree relaxed in the case of damage to passengers from what it is in reference to things in their care."

The general rule is stated as follows in 10 Corpus Juris, sec. 1302, p. 863:

"A carrier of passengers is not as absolutely liable for the safety of the passengers as a carrier of goods is for the safety of the goods; but it is only liable for injuries to passengers which are caused by its negligence in failing to exercise the proper degree of care, skill, and diligence for such passengers' safety, and therefore is not an insurer of the safety of passengers, in the sense in which a carrier of goods is said to be an insurer of the safety of the goods, and hence is not liable for injuries caused by an accident which an exercise of the proper degree of care, skill, and diligence could not anticipate or prevent."

For the reasons assigned, the judgment appealed from is reversed and avoided, and plaintiff's suit dismissed at her cost in both courts.