## BEACH v. UNION BREWING CORPORATION et al., and three other cases.†
### Nos. 17150, 17147, 17148, 17149.

Court of Appeal of Louisiana. Orleans.
March 27, 1939.

† Rehearing denied April 24, 1939; writ of certiorari denied by Supreme Court May 29, 1939.

J. Elton Huckabay and Claude E. Fernandez, both of Baton Rouge, for appellants.

Alvin R. Christovich, of New Orleans, for appellees.

JANVIER, Judge.

There are involved here four suits for damages. They result from a motor vehicle accident which occurred at about 10:30 o'clock on the night of September 10, 1937, on the Airline Highway a little more than a mile on the New Orleans side of the Lutcher Junction.

The vehicles involved were a Ford coach owned and driven by Everett G. Smith, one of the plaintiffs, and an unlighted 'stationary truck and trailer owned by defendant, Union Brewing Corporation, and at the time in charge of Earl Laird, an employe acting within the scope of his employment. The truck and trailer—to which, for convenience, when we refer to the entire conveyance, we shall call the "truck",—had been proceeding towards Baton Rouge, as was the Ford coach when it ran into the rear of the stationary trailer.

With Laird on the front seat of the truck was Louis Liemann, a helper. Just before it reached the point at which the accident occurred and just as it was about to pass a vehicle going in the opposite direction, Laird attempted to "dim" the lights of the truck. As he did so, all of the lights were suddenly extinguished by the burning out of an electric fuse, as it was later discovered. When the lights went out, the vehicle was in total darkness. Instead of driving off the paved portion of the highway, Laird brought the truck to a stop on the extreme right edge of the concrete. While it was standing in that position, the Ford coach of Mr. Smith approached from the rear. On the front seat of the Ford with Smith was Charles Kenneth Beach, a guest passenger, and on the rear seat was Alfred T. Allen, another guest. As the Ford approached the stationary truck, which none of the occupants of the Ford noticed, there was approaching from the opposite direction another automobile. The driver of this third car and Smith both "dimmed" their lights and, just as Smith again turned on his bright lights, which extended further along the road ahead, he noticed the stationary truck, but he was at that time so close to it that he could not stop and his Ford crashed into the rear end of the said trailer. All three of the occupants of the Ford were injured and the Ford itself was seriously damaged.

The Home Insurance Company of New York had issued to Smith a policy of insurance in which it had agreed to protect him against loss in excess of $50 caused by damage sustained by the Ford as the result of collision. The said insurance company, as plaintiff in one of these suits, seeks recovery in the sum of $242.87, averring that it paid to Smith all but $50 of the loss resulting from damage to his car and that, by this payment, it became subrogated pro tanto to Smith's rights against the parties at fault.

Thus, the four plaintiffs are:

(1) The Home Insurance Company;

(2) Everett G. Smith, who claims $5,356 for his personal injuries and his expenses and $50 as that part of the damage to his automobile which he himself was compelled to pay;

(3) Alfred T. Allen, who claims $3,223.50 for his physical injuries and expenses resulting therefrom, and,

(4) Charles Kenneth Beach, who claims $17,867.46 for his physical injuries, expenses, et cetera.

The defendants are:

(a) Union Brewing Corporation, owner of the truck and employer of Laird;

(b) Laird, the driver of the truck, and,

(c) Fidelity & Casualty Company, admittedly the liability insurance carrier of the Union Brewing Corporation.

In the petition eight charges of negligence are set forth in detail. They may be summed up as follows:

(1) That there was negligence in stopping the truck on the concrete portion of the highway instead of on one of the unpaved shoulders. It is alleged that in so doing Laird violated the provisions of Title 2, Section 3, Rule 15(a) of Act 21 of 1932, which, in part, provides that: " * * * in no event shall any person park or leave standing any vehicle, whether attended or unattended, upon any highway unless a clear and unobstructed width of not less than fifteen (15) feet upon the main traveled portion of said highway opposite such standing vehicle shall be left for free passage of other vehicles thereon, * * * ".

(2) That there was negligence in parking the said truck, without lights on the truck itself, or on the trailer, and in particular in that no flares were placed along the roadway, as required by Act 164 of 1936, which, in Section 1, among other things, provides that, at nighttime, "the operator of a motor truck or combination thereof * * * shall immediately upon bringing his vehicle to a stop upon, or immediately adjacent to the traveled portion of the highway, at any time during the period of from one-half hour after sunset to one-half hour before sunrise, place one lighted flare at the side of such vehicle just inside the black line marking the center of paved highways and near the center of dirt or gravel highways; place one lighted flare approximately one hundred feet to the front of such vehicle and place one lighted flare approximately one hundred feet to the rear of such vehicle; and shall maintain such lighted flares in such position during the time said vehicle remains parked".

(3) That there was negligence in not otherwise warning Smith and those with him that the truck was so placed, in other words, in not running back along the highway to flag any automobile which might be approaching, and,

(4) That there was negligence in operating the truck at all since the lighting system was defective.

Defendants denied that there was any reason to believe that the lighting system of the truck was in any way defective and averred that the said truck had been properly inspected and had given no indication of any defect, and they also asserted that the entire cause for the extinguishment of the lights was the sudden and unexpected blowing out of a fuse; that this may occur without any known cause, and that there is no way to determine by inspection whether such a fuse is a perfect one, or is on the verge of giving way.

They also denied that there was any negligence involved in the stopping of the said truck, or in leaving it without lights for the few moments which intervened between the blowing out of the fuse and the collision, and they averred that Laird and his assistant, as soon as the truck could be brought to a stop, did everything within their power to light and properly place the flares, as required by law, and that, before they could get them placed, the Ford, at excessive speed, crashed into the rear end of the trailer.

In the alternative defendants charge contributory negligence in Smith in not seeing the truck and trailer stopped upon the highway, in not having the said Ford under such control as would permit

of its being stopped within the distance illuminated by its headlights, and they charge, also, that both Allen and Beach were themselves independently negligent in permitting Smith to drive at that rate of speed and in not themselves noticing the stationary truck ahead of them.

There was judgment below in favor of defendants, dismissing all suits. All plaintiffs have appealed.

We start our consideration of the charges of negligence with that concerning the alleged defective condition of the truck, because, if the lights were extinguished because of a defect of which the employes of the brewing company were or should have been aware, we need go little further in determining whether there was primary negligence because it is obvious that the failure of the lights was the initial circumstance in the chain of events which terminated in the accident.

But we fail to find that there was any discoverable defect in the lighting system of the truck. There had been an inspection on that day and all of the lights were shown to have been in perfect condition so far as could be ascertained by inspection or by test. That there was no defect in the system except that resulting from the blownout fuse is made evident by the fact that, shortly after the accident, when a temporary fuse was installed, the lights burned perfectly. Had there been any other defect, or "short" in the lighting system, the temporary fuse would not have restored the system to perfect normal condition.

A fuse is a small piece of soft metal resembling a wire; it is encased in a small cylinder of glass. It is weaker and softer than is any other part of the lighting system and it is inserted somewhere in the system so that, if any trouble develops, it will melt, and thus disconnect the current, so that no damage will be done to any other part. It is shown that the life span of a fuse can never be determined in advance. It is also shown that no inspection can serve to inform the inspector whether the fuse will remain serviceable for years, or will blow out at the next instant. There was no method, then, by which it might have been ascertained that this fuse might burn out. As a matter of fact, had it been removed and a new one installed instead, it is entirely possible that the new one might have blown out at once, whereas the old one might have remained intact indefinitely. Thus, there was no negligence involved in the burning out of the fuse, or in not having installed a new one. The defect in the fuse was obviously a latent one; it was not discoverable and, hence, in this respect there was no fault in any of the employes involved. Even a carrier is not liable where the accident results from a latent defect which could not have been discovered in advance. Martin v. Interurban Transportation Company, 15 La. App. 256, 131 So. 514; Jackson et al. v. Natchez & Western Railway Company, 114 La. 981, 38 So. 701, 70 L.R.A. 294, 108 Am.St.Rep. 366.

Next it is said that there was negligence in stopping the truck while it remained entirely on the concrete, or paved portion of the roadway, and that Laird should have driven it either to the right or to the left, so that it would have left the highway entirely clear for other traffic, and it is argued that, in so stopping it, Laird violated Title 2, Section 3, Rule 15(a) of Act 21 of 1932, in that he left open for other traffic a passage of less than fifteen feet on the concrete portion of the highway.

It appears that the truck was somewhere between 6½ and 9 feet wide and that the concrete was 20 feet in width. Therefore, when the truck stopped entirely on the concrete, there remained less than 15 feet for other traffic. But Laird explains that, as his lights suddenly went out, he was plunged into almost Stygian darkness, and could only dimly see the outlines of the concrete road and could not tell whether it would be possible to drive upon the small shoulder on the right, and that he felt that to drive across the road to the wider shoulder on the left might have brought about an even more dangerous situation. He explains that on the right, immediately beyond the very narrow shoulder, there was a canal, or ditch, toward which the shoulder sloped, and that, while the shoulder on the left was very much wider, it was overgrown with grass and weeds, and he feared that, because of the soft ground, possibly the truck itself might stall with the trailer extending across the concrete portion of the highway and that, thus, there would be created a much more serious danger. The truck and trailer were very heavy, the trailer itself being loaded with ten tons of beer, and the two vehicles together were so long that, had the truck stalled—as

Laird feared—the entire highway would obviously have been blocked. Laird said that he realized this danger instantaneously and decided to stop entirely on the concrete.

It is true that the two police officers who arrived later parked their cars on the wide shoulder to the left and encountered no difficulty, but they did so with the assistance of their headlights, which enabled them to see as they drove upon the shoulder. Furthermore, the vehicles in which they arrived were light in weight as compared to the equipment of Laird. One of the officers—Pollet—admits that, in wet weather, he would not have driven even his light car upon that shoulder.

Furthermore, the legal requirement that 15 feet be left under all circumstances has no application to vehicles disabled in emergencies. The statute itself, in rule 15(c) provides that it shall not apply to a vehicle which is disabled "to such an extent that it is impossible to avoid stopping and temporarily leaving such vehicle in such position."

In Mouton v. W. J. Talbot & Son, 161 So. 899, our brothers of the First Circuit held that that portion of the statute has no application to a disabled vehicle. It is true that, in the Mouton case, the vehicle could not be moved at all, whereas, in the case at bar, the motor still operated and the vehicle could have been moved. But we believe that it should not have been moved for the reasons to which we have already referred and we see no difference, so far as the statute is concerned, between a vehicle disabled in that it cannot move under its own power and a vehicle which it would be dangerous to move because of surrounding circumstances.

We conclude that Laird was not at fault in stopping upon the concrete.

■ We now consider the serious question of fact on which the parties are at odds.

Plaintiffs maintain that, even if there was no other negligence, still Laird and his helper, Liemann, were at fault in not placing their emergency flare lights as soon as the truck stopped. That they are by law required to do so is conceded, as necessarily it must be, in view of Section 1 of Act 164 of 1936, from which we have already quoted and which requires that these flares shall be "immediately" placed. Laird and Liemann say that, as soon as the truck could be brought to a stop, they attempted to light and properly place these flares, but that, before they could do so, Smith's Ford approached and ran into the rear end of the trailer.

Plaintiffs, on the other hand, contend that they did not at once attempt to place the flares, but that instead Laird made an effort to repair the burned-out fuse and that it was because of this delay that the collision occurred before the flares were placed. Of course, plaintiffs produced no eye-witnesses to testify as to this delay, but they rely on several circumstances and upon the testimony of two police officers, who state that Laird told them that he had attempted to fix the fuse before undertaking to place the flares.

We shall first discuss the circumstances upon which plaintiffs rely in their attempt to show that there was a delay in the placing of the flares. They show that, according to the time which elapsed after the truck left Laplace—some distance away—there should have intervened about ten minutes after it stopped before it was struck by the Ford. But the time schedule testified to is shown to have been based on approximations and estimates, and these mere approximations should not in themselves be permitted to overcome the actual testimony that the truck had stopped only a minute or so before the collision occurred.

Another fact is that, after the accident had occurred, when it was suggested that Laird should repair the fuse, it was found that he had the fuse in his possession—either in his hand, or in his pocket—and that he did not have to go to the truck to remove it from the receptacle. It is argued from this that he must have made some effort to repair it before the accident occurred. But he denies absolutely that he had previously removed it and it may well be that, after the accident and before anyone else thought of repairing the fuse, he had already taken it out of its socket.

The serious difficulty is presented by the testimony of the two police officers, Pollet and Landry. Both of them state that as soon as they spoke to Laird he said that he had attempted to repair the fuse before placing the flares. But there are circumstances to which defendants point as showing that these two officers are inaccurate in some of their statements. Landry, for instance, was some thirty or forty miles away when the accident occurred. It required some time for him to receive

notice and then further time for him to arrive at the scene, though he says that "we come up here ninety miles an hour". When he reached the scene the flares were already burning and in their proper places, and yet he says that, even before he inquired as to the cause of the accident, he approached Laird and—to quote from him— " * * * the first thing I said was, 'Buddy, what is the matter with your flares' * * *" —a most improbable question in view of the fact that the flares were then burning and in their proper places. So that, so far as he knew, they may not have had anything whatever to do with the accident.

But, strangely enough, though he says that he asked Laird about his flares, he also said that he could not remember whether, when he got there, the flares were burning or not. If, in his own concern to uphold the majesty of the law and to make certain that the statute requirements respecting flares should be complied with, he directed his whole attention to the necessity for the flares, it seems strange indeed that he should not have known definitely whether they were burning.

Mr. Pollet, the local officer, deputy sheriff of the Parish of St. James, also says that Laird said to him that he had not put the flares out because he "intended to fix the lights and leave". But it is also shown that Pollet did not know whether the flares were lit and in place when he arrived, though there is no doubt whatever, from the other evidence, that they were burning and in their proper places at the time. Pollet also testifies that when he got there the employes of the principal defendant were on the right-hand side of the truck, apparently getting the flares ready to be placed, whereas the record shows beyond any possible doubt that the flares had never been on the right side of the truck and that they had been entirely placed and were burning when Pollet arrived.

At any rate, our brother of the District Court refused to accept the testimony of these two witnesses, stating that "their testimony is not convincing".

Another fact to which plaintiffs point as indicating that there must have been time for the placing of the flares was that the disabled truck was on a straight piece of road which extended for about a mile and a half in each direction, and that since, when the truck stopped, the employes did not see any vehicles approaching from either direction, these vehicles must have been some distance away and this should have afforded sufficient time for the placing of the flares had they attempted to place them immediately. But the vehicles which were involved—the Smith car on the one hand and the car of the unknown owner going the other way—were traveling at considerable speed and could have covered the intervening distance of a mile and a half or so in about a minute and a half to two minutes, and the record shows, beyond any contradiction, that, to take the flares down from the bracket which holds them, requires the loosening of some thumb screws and the lighting of the said flares and that these operations require some two or three minutes, and, therefore, we cannot conclude that the operators of the truck could have placed the flares sooner than they did in view of their positive testimony that they undertook that operation with all possible speed.

The four records which are involved are voluminous and a great deal of testimony was considered by the trial court and appears in the principal one of these records. We feel, however, that we need not discuss this evidence further than to say that the principal question involved is one of fact: whether the employes attempted, with reasonable dispatch, to place the flares in accordance with law—and that the trial judge found that they did. The record makes it impossible that we reach any conclusion other than that he was not manifestly in error in so finding.

Since we find that there was no negligence on the part of defendants, it is not necessary that we discuss the charge of contributory negligence directed at Smith and at his guest passengers.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is affirmed, at the cost of plaintiffs.

Affirmed.