**HUGHES v. BATON ROUGE ELECTRIC CO.**

**No. 1953.**

Court of Appeal of Louisiana. First Circuit.

May 4, 1939.

Rehearing Denied June 6, 1939.

Writ of Error Denied June 26, 1939.

474

Carlos G. Spaht, of Baton Rouge, for appellant.

Taylor, Porter & Brooks, of Baton Rouge, for appellees.

LE BLANC, Judge.

The plaintiff, a colored woman named Leathy Hughes, instituted this suit to recover a rather substantial amount for damages for personal injuries which she claims to have sustained as a result of an accident which happened while she was a passenger on a motor bus belonging at the time to the Baton Rouge Electric Company and which was being operated by one of its employees.

The original defendant was the Baton Rouge Electric Company and after trial, judgment was rendered in its favor rejecting plaintiff's demand and dismissing her suit. On learning that the affairs of that company had been liquidated and in the meantime its property and assets had been sold to the Gulf States Utilities Company, plaintiff obtained an order to have this lattter corporation made party defendant, and on re-hearing of the case judgment was rendered again against the plaintiff and in favor of the newly made defendant. It is from that judgment that this appeal is being prosecuted.

Plaintiff alleges that at about 3 o'clock in the afternoon of October 1, 1937, she boarded the bus of the defendant at the corner of Main and Dufrocq Streets in the City of Baton Rouge and paid the required fare of 7 cents by depositing that amount in a box placed in the bus for that purpose. She avers that she then started to walk to the rear of the bus to the seats designated for colored passengers and while she was still walking "the bus started forward quickly at a rapid speed." This movement she alleges, threw her against one of the seats and partially to the floor of the bus causing her serious and painful injuries which later she sets out in detail in her petition. She avers that the negligence of the bus driver which was the proximate cause of her injuries consisted in his "starting it rapidly and quickly forward," before she had an opportunity to reach her seat, "and at such a lurching speed that he knew or should have known that it was likely to throw her off her balance and cause her to fall and when he knew or should have known that she had not had sufficient time to reach her seat."

Plaintiff avers further that she was aided to her seat by other passengers on the bus and immediately she began to feel a severe pain in her back which caused her to go to bed upon reaching her home, and for which she has required treatment and hospitalization for a considerable time and from which she will continue to suffer for an indefinite period. Her demand is for the sum of $3,500.

The defendant for answer admitted that plaintiff was a passenger on its bus on the date alleged in her petition but otherwise it practically denied each and every allegation thereof. It admitted further, we might add, that plaintiff complained to the operator of the bus of an alleged injury, which it denies however, and further that it assisted plaintiff in giving her the benefit of treatment by its physician but that this was done in accordance with its universal practice to give such assistance to anyone of its passengers who is allegedly injured on one of its buses.

■■ As is to be readily noted, the case involves the application of certain rules of law relating to the duties and obligations of a common carrier to a passenger aboard one of its conveyances. Under the contract which arises out of the relation between them, a carrier owes to the passenger the duty to safely transport him over its lines or routes from the place where he boards its conveyance to the place of his destination and there safely discharge him. Whilst in many instances it has been said that the law imposes the highest duty of care on the carrier in that respect, it is also frequently stated as a matter of law, that the carrier is not the insurer of the passenger's safety. An idea seems to prevail, and it is not without some justification because of certain decisions bearing on the point, that in suits by a passenger against a carrier there is a rather strong modification if indeed not a variance, in the rule of evidence concerning the burden of proof. This idea implies a rule to the effect that all that the plaintiff passenger has to do is to show that he paid his fare, boarded the conveyance and that he sustained an injury and then the burden shifts to the defendant carrier who is held to the strict duty of showing not only that it was free of negligence but that to successfully do so it must also affirmatively show the exact cause of the accident.

This however is not the rule in Louisiana, as is clearly shown in the decision of the Supreme Court in the case of Cusimano v. New Orleans Public Service, Inc., 170 La. 95, 127 So. 376. The erroneous impression to which we refer may have been obtained by confusing the duty of the carrier toward its passenger with its statutory duty in this State with regard to "things entrusted to their care" as embodied in Civil Code, Article 2754, and under which it is made liable for the loss of or damage to such things, "unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events." The distinction with reference to its duty in each instance is clearly drawn in the case of McGinn v. New Orleans Railway & Light Co., 118 La. 811, 43 So. 450, 13 L.R. A.,N.S., 601, and is also indicated in the case of Cusimano v. New Orleans Public Service Inc., supra, In this last case, the court definitely announced its conclusion to be that the doctrine of certain cases which are cited is correct insofar as they hold that "where a passenger is injured, the burden of proof is on the carrier to show that it was free from any negligence which might have caused the accident, but that the doctrine of those cases is too broad (if such be their doctrine) in holding that the carrier can discharge such burden of proof only by showing how and why the passenger was injured, even though it does show that the injury occurred through no negligence of its own." [170 La. 95, 127 So. 378].

In 13 C. J. S., Carriers, p. 1254, § 677, the general rule as to care required of the carrier in regard to its passengers is stated as follows: "Although there is much conflict in the statements by the various courts and authorities as to the care of a carrier in transporting passengers and its consequent liability, * * * and although the carrier does not insure that the passenger will be carried safely * * * the general rule, as stated in Corpus Juris which has received approval, when reduced to its simplest form may be stated to be that the carrier is bound to exercise as high a degree of care, skill, and diligence in receiving a passenger, conveying him to his destination, and setting him down safely as the means of conveyance employed and the circumstances of the case will permit; and that should any injury happen to the passenger not contributed to by his own negligence, but due to negligence on the part of the carrier or its servants, damages may be recovered; * * *." When that rule was laid down it had reference more particularly to electric street cars and railroad trains as those were the means of conveyance in general use at the time. The development of the motor bus as a means of transportation has, to a large extent, made of this conveyance the popular means of conveyance and although it is one that is propelled by a different motive power, it is only in that particular that it may be said to differ from the others as a common carrier.

■■ We find the rule imposing the duty of care on the operator of a motor bus to be the same as in the case of the operation of the electric street car or steam railroad. Blashfield in his Cyclopedia of Automobile Law and Practice, Perm.Ed., Vol. 4, p. 10, § 2151, states that "A common carrier of passengers by motor bus or automobile stage is required to exercise the same degree of care which the law imposes on common carriers of passengers generally." Further, he states that: "While it has been broadly said to

be the duty of the motor carrier to use a degree of care as high as is necessary for the protection of passengers against injuries, a common carrier of passengers by motor bus, like other common carriers, is not an insurer of their safe transportation; being liable only for a failure to exercise the requisite care demanded of one engaged in such occupation. Unless the carrier does something it should not do or fails to do something it should do, or in other words, unless it is guilty of some fault, there can be no recovery against it for injuries sustained by a passenger." We might mention that this last statement in the quotation is taken verbatim from an opinion handed down by Justice Odom at the time he was on the Court of Appeal for the Second Circuit, in the case of Martin v. Interurban Transportation Company, 15 La.App. 256, 131 So. 514.

From all that has been said up to this point, it becomes obvious, in the first place, that in order for the passenger to recover for an injury sustained by him in an accident, it is necessary that there should have been some negligence or fault on the part of the carrier or of its employee in charge of the operation of the means of conveyance being used, and in the second place that when the carrier has shown that the injury occurred though no negligence of its own or through no negligence or fault of one of its employees, it has discharged the burden of proof which the law imposes upon it.

We come now to the consideration of the specific charge of negligence which is made against the defendant in this case and which, as is recalled from the statement quoted from the plaintiff's petition, consisted in the bus driver's starting the bus rapidly and quickly forward before she had time to reach her seat and at such a lurching speed that he knew or should have known that it was likely to throw her off her balance and cause her to fall.

On this particular point referring again to 13 C. J. S., Carriers, p. 1382, § 733, subd. e., we find the rule stated as follows: "It is generally held that it is not necessary to hold a car until a passenger is seated, and that the carrier is not liable for injuries sustained by a passenger in the act of taking a seat, in consequence of the starting of the car, unless it is started in a violent, unusual, or reckless manner, or unless the usual conditions and circumstances surrounding a particular passenger as in the case of an enfeebled or infirm passenger, require that the car be held until he is seated." At page 1410 of 13 C.J.S., Carriers, § 750, it is stated: "It may constitute negligence that the train or car is so operated that, by jerking or jarring, passengers are imperiled who are properly conducting themselves with reference to their transportation, and the conveyance must be operated with regard to the situation of the passengers as known to, or as it should be known to, the employees in charge. Thus it may constitute negligence to stop a train or car with such suddenness and violence as to cause injury to a passenger, where there is no justification or excuse therefor. However, in order that the above rule may apply, the jerk or jolt must be unnecessary or unusually sudden or violent; such jerks and jars as are necessarily incident to the use of the conveyance, and are not the result of negligence, will not render the carrier liable for resulting injuries."

With reference to the particular class of conveyance with which we are concerned in this case, that is a motor bus, we look again to Blashfield as an authority on the subject and in the same volume from which we have already quoted at page 15, Perm.Ed., § 2156, we find the author stating: "A motor vehicle common carrier is under a duty to afford embarking passengers an opportunity to reach a place of safety in the body of the vehicle before starting; and the disregard of the duty by starting the bus before such opportunity is given may be an act of negligence. While, in the absence of special circumstances, the driver may start a motor bus which has stopped to take on passengers as soon as all are fully and fairly within the bus, and, in the case of able-bodied adult passengers boarding the bus, it is not absolutely necessary as a matter of law that the vehicle be kept at a standstill until such passengers shall have reached seats, still the law does require that, at that particular juncture, the bus must be operated in the ordinary and usual manner for which passengers should be prepared. * * * The ordinary jolts and jerks of the bus in starting or stopping are among the usual incidents of travel, and for injuries resulting from them the carrier is not liable. The sudden stopping of the vehicle is not of itself evidence of negligence, but the vehicle may be stopped so suddenly as to furnish evidence of negligence. In general, no fixed rule can be laid down as to what constitutes such a sud-

den or abrupt stopping of a bus as to give rise to an inference of negligence; each case being determinable upon the particular facts shown and presenting a question of fact."

From the authorities cited it is apparent that in order for the operator of a motor bus to be held guilty of negligence in starting the bus, the movement must have been one that is unusual in the practical operation of starting a motor vehicle, and of a character accompanied with sufficient force or violence as to take the movement out of the ordinary jolts and jars incident to that method of travel and transportation. The mere fact that the bus is started before the passenger has reached his seat does not of itself, as we have seen, constitute negligence.

With regard to street cars this authority is not without support in this State as we find the Supreme Court stating in the case of Sharp v. New Orleans City Railway Co., 111 La. 395, 35 So. 614, 100 Am.St.Rep. 488: "It has been decided that street cars need not wait until passengers are seated before starting. Herbich v. North Jersey Street Railway Co., [65 N.J.L. 381] 47 A. 427. If defendant exercised due care in the operation of the car, it is clearly not responsible for plaintiff's fall and injury. Cars cannot be started without some jerk, and cannot be run in a curve without developing a centrifugal force. The dangers from these causes are incident to traveling on the cars, and a traveler assumes the risk of them." See, also, Vincent v. New Orleans Railway & Light Co., 134 La. 654, 64 So. 654. The same rule was made to apply with regard to passengers on a motor bus by the Orleans Court of Appeal in the case of Murphy v. New Orleans Public Service, Inc., La.App., 169 So. 890, 891.

There must be some special circumstances surrounding a particular passenger sufficient of themselves to warn the operator of the bus and demanding especial care on his part in order to make the carrier liable for his putting the bus in motion before the passenger is seated. In McRae v. Boston Elevated Railway Co., 276 Mass. 82, 176 N.E. 773, it is stated that "In absence of special circumstances, carrier may start street motorbus as soon as passengers are fairly within bus." The special circumstances to which reference may be made are such as are mentioned in the quotation from 13 Corpus Juris Secundum, Carriers, p. 1382, § 733, subd. e., that is, cases where the passenger is an enfeebled or infirm person and to which we may add as others, instances where the passenger is a blind person, or a lady with a baby in her arms. Certainly in admitting such passengers on the bus, the operator is charged with a greater duty of care to see that they are safely seated before starting the bus than in the case of a vigorous adult person with no sign whatever of any affliction or infirmity.

In our opinion therefore, we are faced in this case with two propositions of fact: First, was the plaintiff a person who demanded more than the usual consideration because of special circumstances attending her appearance which may have required the operator of the bus to hold his bus stationary until she had been seated, and if she was not, was the bus started in a sudden and violent manner or one that was unusual and not of the ordinary and practical method in which such conveyances are started by persons engaged in that occupation? These are questions of fact which have to be determined on the basis of the testimony relating to them as found in the record.

The plaintiff as we have already observed is a colored woman who testified that she was fifty years old at the time of the trial. The date of the trial was eight months subsequent to that of the accident. At that time she was engaged as a servant doing "washing, cleaning up, cooking and things like that." She was hired pretty regularly and there is nothing to indicate from the testimony that she was not an able-bodied person free of any apparent physical infirmities. Whilst it did develop from the medical testimony that her health was not good there was certainly nothing in her physical appearance to indicate to a person who did not know her that there was anything wrong with her. On the very day of the accident she says that she had washed and mopped the house where she was working and had walked some five or six blocks to the corner of Main and Dufrocq Streets to take the bus. The bus driver himself has no recollection of her actually boarding the bus and none of the passengers who appear as witnesses testified about there being anything abnormal in her appearance which would bring her case within the rule making an exception with regard to certain persons under special circumstances where the operator of

the bus would have been required to wait until she had taken her seat before putting the bus in motion.

This takes us then to the second issue of fact on which there is dispute in the testimony, and on which the decision of the case really depends. We have reference of course to the manner in which the bus was actually started.

On this point we have the testimony of four witnesses. These are the plaintiff herself, another colored woman by the name of Juanita Early who testified in her behalf, and two white young ladies, sisters, by the name of Haley. The bus driver professes not to have any definite recollection of the time when plaintiff entered the bus and naturally he does not testify concerning its movement after she entered.

We have taken the trouble to check over the testimony of each of the witnesses named and will refer to it somewhat in detail.

Plaintiff testifies that after depositing her fare in the box she started walking to the end of the bus holding on with her hand and that the bus started up right then and, she says, "that kind of jerked me loose and threw me back and that started me in a trot forward, and Juanita and another lady sitting in the back caught me and helped me to a seat." When asked in what way did the starting of the bus on this occasion differ from that on others, she answers: "It was faster." Later on she is asked to demonstrate what happened and she states "Well I don't know if the benches behind me hit me or not but I fell backwards and then I started going frontwards to the back of the bus."

"Q. You say you don't know if you were hit when you were pulled forward or backwards? A. I don't know, the bus was going fast and that kept me trotting."

On final redirect examination when asked by her counsel when it was that she was thrown against the seat she says, "In that trot the seat hit me when the bus started so suddenly."

The gist of Juanita Early's testimony on this point is to be found in her answer as follows, when she is asked to tell the Judge what she saw: "I saw her get on the bus and she gave the motorman money and he started off so fast that caused her to start trotting and lost her balance all the way back from about the second seat, and I caught her and asked her was she hurt." Later on she again refers to the trotting of the plaintiff and says that the

bus was going so fast that she couldn't catch hold to anything, "And it slammed her against the seat and she started forward."

Miss Mary Haley a young school girl eighteen years of age, testifying as a witness for the defendant states: "The bus driver stopped and he gave her considerable time to sit down, and when the bus started off it gave a sort of jerk, and she kind of fell against the seat I was sitting on * * *." When asked what sort of a jerk it was, she answers, "Just a light jerk." Pressed for an answer as to how bad a jerk it really was, she says "I don't know how to answer that."

"Q. Was it a light or a heavy jerk? A. It was a light—it wasn't a heavy jerk."

The seat into which the plaintiff bumped was the one occupied by this witness and when she is asked the question "Naturally you don't know how hard she bumped the seat," she answers, "No sir, the jar would not have hurt anybody in any way." Miss Margaret Haley, also testifying as a witness for the defendant describes the happening as follows: "When she got on, the bus driver gave her considerable time to sit down, and when he started off he gave the usual jerk and she grabbed on to one of the negroes." She is then asked "What do you mean, the usual jerk?" and she answers, "Just the ordinary jerk a bus or car gives." Later on she is asked these questions, to which she replied as follows:

"Q. Now as I understand when the bus started forward it gave a jerk? A. Not a big jerk, a small jerk.

"Q. And that small jerk caused Leathy to fall against the seat? A. Just a light rub against my sister."

We are of the opinion that the learned trial judge has correctly summed up the foregoing testimony when he states in his written opinion that "there is no convincing evidence in this case that she (plaintiff) was violently thrown against the seat in the bus nor is there sufficient evidence to justify the Court in holding that the jerk of the motor, as the bus started, was of such force and violence as to characterize it as more than normal or usual." As we have already indicated this is a matter which, under the rules from which we have quoted at length, has to be determined in each case upon the particular facts shown, and, relying upon that further rule which accords such weight to the findings of fact of the trial court, we find ourselves

unable to hold that the district judge here has committed such error as to warrant us in setting aside his holding.

It is urged most strenuously that the movement of the bus necessarily had to be violent as the plaintiff was thrown off her balance and bumped into one of the seats. A person losing his or her balance under certain circumstances is a relative matter in which many factors have to be taken into consideration in determining its true cause. The movement of the bus in this case certainly was not of great, if indeed as much force as that of the bus in the case of Murphy v. New Orleans Public Service, Inc., already cited, where the plaintiff was thrown to the floor. Yet in that case the court found nothing to indicate that the starting of the bus was unusual and it was held that "plaintiff's fall was due to his failure to guard against [its] normal movements."

Under the law as we appreciate it and under the facts as found in this case we are in accord with the final judgment rendered below and it will accordingly be affirmed. As the suit was prosecuted under the benefit of the act which relieves impecunious litigants from the payment of Court costs, there will be no decree for costs.

Judgment affirmed.

OTT, Judge (dissenting).

I agree with the general statement of the law given in the majority opinion, but I am forced to disagree with the application of the law to the facts in this case.

If it is conceded (as seems to have been done in the opinion of the trial court as well as in the majority opinion of this court) that the plaintiff did receive an injury while riding as a passenger on defendant's bus, however slight that injury might have been, it then devolved upon the carrier to exonerate itself from any negligence that might have caused the injury. If the carrier has failed to show that it was free from negligence causing or contributing to the injury, it cannot escape liability. Wallace v. Shreveport Railways Company, La.App., 175 So. 86. This rule implies that the carrier must show that the jerk or jolt that caused the plaintiff to lose her balance and fall was not sufficiently sudden and unusual as to cause a person looking out for his safety to stumble and fall, and also it must show that in the usual and ordinary operation of its business the particular kind of a jerk or jolt

that did cause the injury resulting from the fall was not of such a kind as could have been prevented by the use of reasonable and prudent care on the part of the operator of the bus.

Applying this principle to the facts in this case, the facts show that the plaintiff did lose her balance just after paying her fare when the bus started before she reached her seat. The starting of the bus was sufficiently sudden and unusual to cause her to run forward against a seat. The plaintiff and a colored woman sitting in the back of the bus said that the bus started quick, or faster and more sudden than usual. The two white girls, witnesses for the defendant, admit that the bus started with a jar or jerk, but they say the jar or jerk was not unusual or sudden. But their testimony rather corroborates plaintiff and her witness that there was a sufficient jerk or jolt to cause plaintiff to fall against the seat. Under ordinary circumstances of starting and stopping a bus, it is not shown that the bus usually starts with a jerk or jolt of any kind, much less a sufficient jerk or jolt to cause a person going to a seat to stumble and fall by reason of the jerk or jolt. It is not shown that the bus could have been started at that time with a much less jolt or jerk. The fact that people do not ordinarily fall or stumble when going to a seat when a bus starts indicates that a bus can be started without causing a passenger to stumble and fall in the aisle. In looking for testimony in the record to show that the defendant was free of all negligence in causing the plaintiff to stumble and fall against the seat when the bus started, I cannot point to any such testimony.

Certainly the bus operator has not shown his freedom from negligence. On the contrary, he did not even see the plaintiff when she stumbled and fell and did not know that she had fallen. If, as he says, he could see a passenger going to a seat in the aisle when he starts his bus, there is no reason why he should not have seen the plaintiff as she attempted to reach her seat. Had she been ever so feeble he would not have taken any more precautions in starting than he did, as he admits that he did not know the plaintiff had not reached her seat when he started. In fact, he attempts to say that she had reached her seat, even though he did not see her fall, and the fact that she did fall is testified to by defendant's only other two witnesses.

Under the circumstances, any testimony given by the bus operator that he did not start the bus before the plaintiff reached her seat, or any testimony that he gave to the effect that he did not start the bus with any unusual jerk or jar, is purely negative, as it is not to be presumed that he knew just how fast and quick he did start the bus, if he does not even remember plaintiff getting on at that point. The only probative value to be given his testimony would be the same as a general statement on his part that he did not usually start the bus with a sudden or quick motion, which, of course, is too general a statement to have much probative value as to the manner in which he started the bus at the place and time when plaintiff was injured.

While the law is clear that, except in those cases mentioned in the majority opinion, the operator of the bus is not required to wait until passengers are seated before starting the bus, yet this rule carries with it the further rule that the bus should be started under such circumstances with no greater jolt or jerk than is necessary and usual for that particular type of conveyance. Defendant has not shown just how much of a jerk or jolt is usual and necessary in starting the particular kind of bus which it was using at that time in conveying passengers for hire. For all the court knows, these buses can be started without any appreciable jolt or jar at all—certainly not enough to throw a passenger off balance while going to a seat.

I respectfully dissent.