**BATES v. HAYDEN et al. (NATIONAL CASUALTY CO., Intervenor).**

Nos. 17093, 17094.

Court of Appeal of Louisiana. Orleans.

May 8, 1939.

Rehearing Denied May 22, 1939.
Writ of Certiorari Denied June 26, 1939.

See, also, 188 So. 170.

Dufour, St. Paul, Levy & Miceli and Anna Judge Veters, all of New Orleans, for appellants.

M. C. Scharff, Cicero C. Sessions, and A. Brown Moore, all of New Orleans, for appellee Bates.

Gordon Boswell, of New Orleans, for intervenor-appellee.

McCALEB, Judge.

The plaintiff, Joseph A. Bates, instituted this suit to recover the sum of $39,144.15 as damages for the injuries he sustained on January 5, 1937, when he was run into and knocked down by a truck driven by a negro named Robert Barrett on the Jefferson Highway near Harahan, Louisiana. The defendants in the case are Barrett, the truck driver, Thomas H. Hayden, the alleged owner of the truck, and General Accident Fire and Life Assurance Corporation, Ltd., which is alleged to be Hayden's liability insurance carrier. Plaintiff claims that the injuries he sustained in the accident are due solely to the fault of Barrett who is charged with numerous acts of specific negligence.

The defendants deny all of the allegations of plaintiff's petition. They further specially plead that Barrett, the truck driver, was not at fault and that the accident occurred through plaintiff's imprudence. In the alternative, they set forth that, if it should be found that Barrett was guilty of negligence, then plaintiff is chargeable with contributory negligence which bars his recovery.

The National Casualty Company, a foreign corporation, which had paid Bates compensation for his injuries in conformity with a policy of insurance issued by it to his employer, Rebecca Fabacher, Inc., intervened in the proceeding and, in accordance with the provisions of Section 7 of Act No. 20 of 1914 as amended, sought recovery of the sum of $712.87 (compensation paid to Bates and expenses incurred on his behalf) plus reasonable attorney fees.

Following a protracted trial of the case upon its merits, the district court rendered a judgment in favor of the plaintiff and against the defendants, Barrett and General Accident Fire and Life Assurance Corporation, Ltd., in solido, for the sum of $9,000, and dismissed the suit as to the defendant Hayden. The court also granted judgment in favor of the intervenor, National Casualty Company (the compensation insurer of Bates' employer), and against Bates, Barrett and General Accident Fire and Life Assurance Corporation, Ltd., in solido, for the sum of $712.87, together with interest from judicial demand, and $150 as attorney fees. The defendant, General Accident, Fire and Life Assurance Corporation, Ltd., has appealed suspensively from the adverse judgment and the defendant Barrett has appealed devolutively. The plaintiff has answered the appeals and prays for an increase in the award granted him by the district court.

Counsel for the defendants maintain in this court that the trial judge erred in finding for the plaintiff for the following reasons: (1) That the General Accident Fire and Life Assurance Corporation, Ltd., should have been dismissed from the case because it did not issue the contract alleged by plaintiff in his petition and upon which liability against it is asserted; (2) that Barrett, the truck driver, was free from fault; (3) alternatively, that the plaintiff was guilty of contributory negligence barring his recovery; and (4) that the award in plaintiff's favor is grossly excessive. We shall discuss these contentions in their respective order.

The evidence in the case shows that Barrett was employed by a corporation named Riverside Lumber Company, Inc., and that he was driving its truck within the course and scope of his employment at

the time the accident occurred. The defendant, General Accident Fire and Life Assurance Corporation, Ltd., had issued to said Riverside Lumber Company, Inc., its liability policy of insurance on the truck involved in the accident and this policy was in full force and effect at the time of the mishap. It further appears that Thomas H. Hayden is the Vice-President of Riverside Lumber Company, Inc., and that his name was painted on the truck instead of the name of the corporation. After the accident, negotiations were carried on between counsel for plaintiff and adjusters of the defendant insurance company looking toward an amicable settlement of the case. The correspondence had between these parties shows that plaintiff's counsel were never informed by the adjusters of the insurance company of the fact that the truck was owned by Riverside Lumber Company, Inc., and that the policy of insurance had been issued to it. On the contrary, it is pertinent to remark that the adjusters for the insurer, while not specifically saying so, led counsel to believe that the truck had been insured by Hayden and that the policy had been issued in his name. As a result of this, counsel for plaintiff, when they filed this suit, made Hayden a party-defendant and alleged that the defendant insurance company had issued to him a policy of liability insurance on the truck involved in the accident. This allegation, which is Article 22 of plaintiff's petition, reads as follows:

"Petitioner avers, on information and belief, that the General Accident Fire & Life Assurance Corporation, Ltd. has issued to the co-defendant, Thomas H. Hayden, a policy of insurance wherein it obligated itself to indemnify any person, or persons, and particularly your petitioner, for any injuries sustained by any person, or persons, and particularly your petitioner, *growing out of the negligent operation of the automobile truck which struck and injured your petitioner.*" (Italics ours)

The defendants, in their answer, denied the above quoted averments. The insurance company now maintains that, because the policy, which it produced at the trial upon plaintiff's request, is issued to Riverside Lumber Company, Inc., and not to Thomas H. Hayden as charged in the petition, it is free from responsibility. In other words, the proposition is that, since plaintiff has alleged that the insurer is liable by reason of a contract made by it with Hayden and has not been able to show the existence of such an agreement, it should be exonerated in spite of the fact that the policy it produced shows that it has insured the identical truck involved in the accident against public liability.

We find no substance in the argument. Act No. 55 of 1930 permits an injured plaintiff to bring a direct action against the insurer of the vehicle and the latter has the right to assert all lawful conditions contained in the policy in the same manner as if the suit had been filed against it by the named assured. There was no necessity for the plaintiff to join the owner of the truck as a party-defendant and his allegation that the policy was issued to Hayden may be treated as surplusage. The only matter of importance is that the defendant insurer issued a public liability policy by which it agreed to indemnify all persons legally responsible for the negligent operation of the truck. This is its agreement and, as Barrett is an "Additional Assured" under the omnibus clause of the policy in evidence, it cannot be heard to say that it is being sued on a contract it did not make merely because the plaintiff alleged, on information and belief, that the policy was issued to Hayden when it was made in the name of Riverside Lumber Company, Inc. Moreover, we cannot see that the defendant insurer has been prejudiced in any manner as a result of plaintiff's erroneous averment. After all, it issued the policy and it was in a better position than plaintiff to know the terms and conditions of the contract. It has not only insured the Riverside Lumber Company, Inc., but has also contracted to protect the defendant Barrett who was operating the truck under the instructions, and with the permission, of the named insured.

Counsel for the defendant also proclaim that there is no liability on the part of the insurance company under its policy because the omnibus clause has been eliminated from the contract in view of an endorsement attached thereto, the pertinent part of which reads as follows:

"In consideration of the premium at which this policy is written, it is expressly understood and agreed that the automobile described therein will be used to carry employees of the assured to and from their place of employment. * * *

"The Additional Assureds Clause of this policy is hereby eliminated as respects the coverage provided under this endorsement
* * *"

The purpose of the above quoted clause is clear. The policy provided that the insurer would not be liable in case the truck was used as a conveyance for the regular carriage of passengers. The endorsement simply permits the named assured to convey its employees to and from their place of employment and excepts from coverage the agreement it made to indemnify all persons operating the truck with the permission of the named assured when the vehicle is being used for that specific purpose. The clause did not have the effect of diminishing its coverage but actually expanded it. The insurer does not claim that Barrett was using the truck for the purpose of transporting himself from his home to his place of employment at the time of the accident. On the contrary, he was actively engaged in the business of his master and was acting within the course and scope of his employment.

The accident occurred on the Jefferson Highway at a point about a mile above the town of Harahan, Louisiana, at 8:30 P. M. on a dark and misty night. Bates, the plaintiff, was employed by Rebecca Fabacher, Inc., as a driver of its trucks and vans. On the morning of the accident, he had driven a large truck with trailer attached from New Orleans to Baton Rouge, Louisiana, where he had delivered certain freight and was on his return trip to New Orleans when suddenly, at a point on the highway just above the Colonial Country Club, the lights on the truck and trailer became extinguished as the result of a short circuit in one of the connecting wires. The truck was provided with flares in conformity with the provisions of Act No. 164 of 1936. Bates states that, when the lights went out, he pulled the right wheels of the vehicle over onto the shoulder of the road and stopped; that the three flares were located on the floor board of the cab of the truck and that he immediately lit one of them, opened the left door of the cab, got out and walked to the end of the trailer with the lighted flare in his hand, it being his intention to place this flare approximately 100 feet to the rear of the trailer in accordance with the State act. He further declares that, when he arrived at the rear of the trailer, he saw the lights of a vehicle, proceeding towards New Orleans, approaching him; that he waived the flare, signalling danger to the driver of the oncoming car, and that, as he was doing so, he was struck by this automobile. He remembers no more, as the blow he received rendered him unconscious and he remained in that condition for a period of at least two weeks.

Barrett, the negro driver of the truck which struck Bates, gives a most amazing account of the accident. He says that he went to work at 7 o'clock on the morning of that day and had been steadily engaged (excluding a half hour for lunch) until the accident occurred. During the afternoon, his employer had him drive its truck to Pass Manchac, Louisiana, for the purpose of delivering certain machinery. After he had made this delivery, in accordance with his employer's instructions, he was returning to New Orleans when the accident happened. He says that he was driving at a speed of between 20 and 25 miles per hour; that he was negotiating a curve very near the point where plaintiff's truck with trailer was parked without lights and that, when he first saw it, he was approximately 45 feet from it. He further declares that, upon observing the vehicle, which, according to him, was parked over the center of the road, he slowed down and blew his horn; that, seeing that he had sufficient room to pass to the left of it, he continued forward at about 10 miles per hour; that, when the front wheels of his truck arrived at a point parrallel with the rear of the trailer, he saw Bates standing on the road by the front door of the cab of the parked truck; that Bates was facing the right or towards the cab of the truck and that he, Barrett, had ample room, between Bates and the left hand side of the road, to pass; that just then Bates suddenly "wheeled" around and walked towards the left shoulder of the road or directly in the path of Barrett's truck; that, confronted with the sudden emergency thus created, he (Barrett) swerved his truck into the ditch on the left hand side of the road in an attempt to avert striking the plaintiff; that, notwithstanding, Bates continued to "wheel" to the left and upon the shoulder of the road and that Bates evidently slipped under the front portion of his truck which had then come to rest in the ditch.

Our brother below did not believe the testimony given by Barrett. Neither do we.

The plaintiff and Barrett were the only eye-witnesses to the accident. Just after the mishap occurred, a Mr. Maggiore, who was driving his automobile in the direction of New Orleans, accompanied by a Miss Hemmelder, arrived upon the scene. They testified that, shortly before the occurrence, Maggiore was driving his car at a speed of 35 miles per hour; that the truck driven by Barrett passed them on the road at a speed in excess of 40 miles per hour and that, a few seconds after Barrett had passed them, they arrived at the point where the accident had occurred.

We are convinced that Barrett was driving the truck at a reckless rate of speed and without paying any regard to the hazards of the road. The fact that the night was dark and misty placed upon him the burden of driving more cautiously and at a slower rate. The trailer of the parked truck was painted a yellow color and was easily visible. It is plain to us that Barrett, due to his inattentiveness, failed to notice the presence of the disabled vehicle on the highway until he was nearly upon it, in spite of the fact that it was visible for a distance of at least 300 feet, and that, while he was successful, by swerving sharply to the left, in avoiding a collision with the trailer, he was negligent in not having observed it sooner and in not seeing the plaintiff, who was standing alongside of it with a lighted flare in his hand. We are also satisfied that, at the time Barrett approached the disabled truck and trailer, he was traveling at a fast rate of speed and that if he actually saw the plaintiff, which we doubt, he observed him at a time when it was too late to do anything about it.

Counsel for the defendants, however, maintain that Bates was guilty of contributory negligence. It is said that he violated the provisions of Act No. 21 of 1932, Section 3, Rule 15 (a) and (c), in that he parked his unlighted truck and trailer on the paved portion of the highway without leaving a clearance for approaching traffic of at least 15 feet. This contention is not well founded for the reason that the vehicle was suddenly disabled due to no fault of the plaintiff and we are convinced that he did everything that a prudent driver would have done under similar circumstances and that he parked the truck and trailer in such a position so as to give as much clearance as possible to other traffic. The paved portion of the road is only 20 feet wide and plaintiff's evidence, as corroborated by the testimony of Mr. Maggiore and Miss Hemmelder, is that the right wheels of the truck were parked on the right shoulder of the road. It is true that the defendants produced four witnesses who stated that, when they saw the parked truck sometime after the accident, the right wheels were on the pavement and not upon the shoulder of the road but we feel that plaintiff's evidence on this point clearly preponderates over that of the defendants. Moreover, we have but recently held in Beach v. Union Brewing Corporation, 187 So. 332, that the provisions of Section 3, Rule 15 (a) and (c) of Act No. 21 of 1932, have no application, in cases like this, where the parked vehicle has become disabled as a result of an emergency.

Counsel further say that Bates was guilty of negligence violative of Section 3, Rule 11 (d) of Act No. 21 of 1932, which provides that a pedestrian using a highway shall be required to walk on the left side thereof as near as possible to the edge of the road under penalty of being regarded as prima facie at fault for any consequence of his failure so to do. We cannot comprehend that the rule is applicable under the conditions obtaining in this case. Bates' vehicle was suddenly disabled. It was his duty, under the Act of 1936, to immediately light his flares and place them at designated points as a warning of danger to oncoming traffic. He was acting in strict obedience to the mandate of the law when he left the cab of the truck with the lighted flare which he intended to place at approximately 100 feet from the rear of the trailer. He certainly could not anticipate that an oncoming motorist would fail to see the lighted flare in his hand, which he waived as a signal for the approaching truck to stop.

It is also asserted by counsel for defendants that Bates was at fault in getting out of the left side of his truck and walking in the middle of the highway when he could have avoided any possibility of being injured by using the right shoulder of the road for the purpose of putting out the flares. This argument is fallacious because it assumes that there was sufficient room on the right shoulder of the road for Bates to walk and forasmuch as it is predicated upon the belief that Bates did not have a lighted flare in his hand.

After a careful examination of the record, we conclude, as did our brother below, that the plaintiff was without fault in the premises. Bates' testimony strikes us as being most sincere and we believe him when he says that he walked to the rear of his parked vehicle with a lighted flare in his hand.

Since it is our opinion that the accident was caused through the negligence of Barrett, we finally consider the quantum of damages.

■ That Bates was struck a very severe blow and suffered injuries of a most serious character cannot be disputed. Doctors Johnson and Houston, the physicians who treated Bates at the request of the insurance company for his employer, Rebecca Fabacher, Inc., describe his injuries to be:—multiple contusions and brush burns of the entire body; fractures of the third, fifth, sixth, seventh and eighth ribs on the right side (the sixth·rib fractured in two places and the seventh in three places); a fracture of the seventh thoracic vertebra and a severe concussion of the brain. Immediately after the accident, Bates was taken to the Charity Hospital in an unconscious state. Two days later, he was removed to the Baptist Hospital. He did not fully regain his consciousness until approximately three weeks after the accident. Dr. Johnson says that, when he was admitted to the Baptist Hospital, his temperature, taken by axilla (which is one degree less than that taken by mouth), was 103 degrees. His pulse varied between 110 and 130 and his respiration was between 25 and 35. He developed broncho-pneumonia and was placed under an oxygen tent. For the first ten days of his illness, Bates' condition was very critical and his doctors express the opinion that, during that time, it was extremely doubtful as to whether he would ultimately recover. On January 27, 1937, a cast was applied to his body and he was kept in the hospital until April 3, 1937, when he was permitted to go home. He thereafter remained under the care of his doctors until August 27, 1937, when he was advised by them that he could attempt the performance of light work. Subsequent to this, he tried to work as a night watchman but, after a week's service, was compelled to discontinue as a result of the pains he suffered in his back. For several months after his discharge from the hospital, Bates was forced to wear a back brace because of· the fracture of his vertebra.

There is much testimony pro and con as to whether the plaintiff has sustained permanent disability. Our brother below, who saw and heard the witnesses, states, in his reasons for judgment, that: "It is my opinion that Bates will never again be able to do hard, laborious work. In fact, he will never again be able to perform the duties of a truck driver, which work requires endurance and concentration for hours at a time."

We feel that the above quoted remarks of the district judge are amply borne out by the testimony in the case. The court awarded the plaintiff the sum of $7,500 for his personal injuries and the pain and suffering he has endured as a result thereof. We believe that the allowance is approximately correct and that it represents just compensation to the plaintiff for his hurts.

■ The district judge also awarded plaintiff the sum of $1,500 for the fees of Doctors Johnson and Houston, the physicians who treated him throughout his illness. Counsel for the defendants declare that this allowance is plainly excessive in view of the fact that there is evidence in the record to show that the doctors, who were the regularly employed physicians for the compensation insurance carrier of plaintiff's employer, were willing to accept $800 from the National Casualty Company in the event the defendants were not cast in this case. It is true that Mr. Eberhardt, an adjuster for the National Casualty Company, stated that Dr. Johnson gave him cause to believe that, if the National Casualty Company had to pay the physician's bill, it would be $800. Doctors Johnson and Houston not only deny that they ever made such a statement to Mr. Eberhardt but they clearly explain to our satisfaction why they insisted upon payment of their bill for $1,500.

Dr. Johnson says (and he backs up his declaration by letters written by him to the National Casualty Company) that, when Bates was first injured, he immediately contacted the National Casualty Company; that he informed it that the case was a very serious one; that the expense attendant to the proper treatment of plaintiff would exceed its statutory liability under the Compensation Act ($250) and that he

estimated that the medical expense would be about $1,000. He says that he gave the National Casualty Company this information because he wanted to ascertain whether it would agree to bear that part of the expense which exceeded its statutory liability. He further asserts that, due to the nature of the services rendered Bates by Dr. Houston and himself, he felt that a fair fee would be $1,500 and that he advised the National Casualty Company to this effect. He says that, later on, pending negotiations to compromise the case with the present defendants, he agreed that, for the purpose of facilitating an amicable settlement, he would be willing to deduct 20% from the amount of the doctor bill.

A careful review of the evidence has convinced us that the fees charged by Doctors Johnson and Houston are modest and that, if the services had been rendered to a man of means, a bill amounting to several times the sum charged would not be excessive.

Bates was confined to the hospital for three months and his bill for hospital charges, nurses, etc., was approximately $650. Surely, it cannot be seriously contended that the physicians, who treated him for over eight months and who are probably responsible for his recovery, are not entitled to be compensated in the sum of $1,500 (which is less than three times more than the amount expended for hospitalization and nursing.)

The award in favor of the intervenor, National Casualty Company, is not in dispute and counsel for plaintiff have acknowledged in their brief that the judgment in favor of the intervenor must be settled prior to the liquidation of the defendants' debt to plaintiff (all in conformity with Section 7 of the Workmen's Compensation Act.)

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.